## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARK A. PENDLETON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 07-1884 (JDB)** |
| | ) | |
| **MICHAEL B. MUKASEY,** | ) | |
| **Attorney General,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

Defendant's motion suffers from a fatal flaw: equating a defense on the merits with allegations supporting venue. Assistant Inspector General Thomas McLaughlin is a central figure in this case, not a rubber stamp for selections made by an interview panel (Cplt., ¶¶28-32, 46). McLaughlin is stationed in Washington, D.C., and was located here when he passed over Mr. Pendleton for promotion (Pendleton Decl., ¶¶5-6; McLaughlin Decl., ¶1). That is why venue lies in this judicial district. 42 U.S.C. §2000e-5(f)(3).

McLaughlin himself established the selection process for the positions at issue here; chose the successful candidates in Washington, D.C., after conferring with the Inspector General here; and identified himself during the investigation of Mr. Pendleton's administrative complaint and elsewhere as the "selecting official" (McLaughlin Dep. II at 13-30 & Dep. Exh. 1, 6, 8 at 3; Pendleton Decl., ¶¶5-6). McLaughlin also ignored Mr. Pendleton's highly successful work on two complex investigations in passing him over, even though McLaughlin and his predecessor specially assigned these cases to Mr. Pendleton to test him for promotion (McLaughlin Dep. I at 97-100 & Dep. Exh. 14).

Mr. Pendleton is an African American Special Agent employed by the Office of Inspector General ("OIG") of the Department of Justice ("DOJ" or "the agency") (Pendleton Decl., ¶2). Among other honors, Mr. Pendleton has received three substantial Inspector General's Awards for Sustained Superior Performance (Id., ¶¶13; McLaughlin Dep. I at 49-54 & Exh. 12, 13; Bondurant Dep. Exh. 7-10). Mr. Pendleton was the plaintiff in a prior suit which alleged that DOJ OIG discriminated against him on the basis of his race in passing him over for two new Grade 14 Senior Special Agent positions in July of 2003. Pendleton v. Gonzales, Civil Action No. 04-1838 (D.D.C.) ("Pendleton I"), appeal pending, No. 07-5296 (D.C. Cir.). This case ("Pendleton II") alleges that DOJ OIG passed over Mr. Pendleton for two more Grade 14 positions in May of 2005, to discriminate against Mr. Pendleton on the basis of his race and to retaliate against Mr. Pendleton for prosecuting Pendleton I (Cplt., ¶¶57-92).

While Pendleton I was proceeding, McLaughlin and his predecessor decided to assess Mr. Pendleton's performance in two important investigations under the supervision of DOJ OIG's only African American manager (McLaughlin Dep. I at 88-92; Pendleton Decl., ¶¶7-10). DOJ OIG conceived of this assignment as a test for Mr. Pendleton with a special purpose in mind (McLaughlin Dep. I at 90). If he completed these two cases "successfully within the timeframes allotted … he would be promoted to a Grade 14, senior special agent" (Id.).

As originally conceived by DOJ OIG, there was going to be one additional condition to the test: Mr. Pendleton would have to agree to dismiss Pendleton I (McLaughlin Dep. I at 90). Although the parties never reached an agreement on this condition, DOJ OIG moved "forward" anyway (Id. at 92). According to McLaughlin,

DOJ OIG did so "to show the good faith of the organization" and therefore "proceeded with [its] element of that nonagreement" (Id. at 97, 98).[1]

In late January of 2005, Mr. Pendleton's special assignment was completed, and his temporary manager e-mailed McLaughlin and wrote that Mr. Pendleton had done "a great job in both" cases (McLaughlin Dep. I, Dep. Exh. 14). McLaughlin had no reason "to question" this "overall judgment" of Mr. Pendleton's performance (Id. at 99).

Coincidentally, the two Senior Special Agent positions that are at issue in this case were open for competition at the same time (McLaughlin Dep. II, Dep. Exh. 2). However, in making the final selections, McLaughlin gave no consideration to Mr. Pendleton's successful work on the special assignment he himself made and does not "know how" failing to do so "shows good faith" on the agency's part (McLaughlin Dep. I at 98). In fact, McLaughlin did nothing in response to this assessment of Mr. Pendleton's performance (id. at 101); and there is no indication in the memorandum from the senior member of the interview panel that McLaughlin made the panel aware of Mr. Pendleton's special assignment, much less the assessment of his performance of this assignment in their evaluation process (McLaughlin Dep. II, Dep. Exh. 7).

McLaughlin's substantive action as selecting official and his retaliatory action in refusing to consider Mr. Pendleton's work while on a special assignment conceived by him and his predecessor more than satisfies Title VII's venue requirement. E.g., James v. Booz-Allen & Hamilton, Inc., 227 F. Supp.2d 16, 22 (D.D.C. 2002); Johnson v. Washington Gas Light Co., 89 F. Supp. 2d 45, 46 (D.D.C. 2000). There is, therefore, no

---

[1]    Mr. Pendleton's special assignment was a test by the agency that it proposed in settlement talks in Pendleton I that were unsuccessful (McLaughlin Dep. I at 101). The assignment and its intended purposes are, therefore, admissible to prove liability in this action. Rule 408, Fed. R. Civ. P. Towerridge v. Tao, 111 F.3d 758 (10th Cir. 1997).

merit to defendant's argument that venue lies exclusively in the Eastern District of Virginia.[2]   Furthermore, defendant has not borne its burden to of justify a transfer. Sheraton Operating Corp. v. Just Corporate Travel, 984 F. Supp. 22, 26 (D.D.C. 1997). Accordingly, its motion must be denied.

### STATEMENT OF THE CASE

Mark Pendleton is a highly accomplished GS-13 Criminal Investigator employed by the Office of Inspector General ("OIG") of the Department of Justice ("DOJ" or "the agency"), who has received three Inspector General's Awards for Sustained Superior Performance (McLaughlin I Dep. at 49-54 & Dep. Exh. 12, 13; Bondurant Dep. Exh. 7-10).  Over the years, OIG management has continuously assigned Mr. Pendleton "priority investigations," cases so designated because of their "particular significance" to the entire Department of Justice (Bondurant Dep. Exh. 1 at 1 (emphasis in original); accord McLaughlin Dep. I at 42-48; Bondurant Dep. at 30).  The Senior Special Agent positions at issue in this case were specifically designed to enhance OIG's handling of "priority investigations" (McLaughlin Dep. II, Dep. Exh. 1).  Mr. Pendleton's experience handling these cases dwarfed the selectees' (Pendleton Decl., ¶¶11-15).

During Pendleton I, in light of the fact that Mr. Pendleton's long-time supervisor had been antagonistic to his promotion efforts, McLaughlin and his predecessor decided to assign Mr. Pendleton responsibility for two priority investigations under the supervision of Willie Haynes, DOJ OIG's only African American manager (Haynes Dep. at 4; McLaughlin Dep. I at 97-100; Pendleton Decl., ¶¶5, 10).  According to McLaughlin,

---

[2]      Moreover, dismissing a Title VII action on the ground of improper venue instead of transferring it is never an appropriate action, because doing so would operate as a dismissal with prejudice.  29 C.F.R. §§1614.302, 1614.310.

the purpose in assigning Mr. Pendleton to work under Mr. Haynes' supervision was "to show the good faith of the organization" and test his abilities under a different manager (McLaughlin Dep. I at 97-98).

On January 24, 2005, Mr. Haynes e-mailed McLaughlin that Mr. Pendleton had done "a great job in both" cases (McLaughlin Dep. I, Dep. Exh. 14). When he did, the agency had just opened two additional GS-14 Senior Special Agent positions for competition (McLaughlin Dep. II, Dep. Exh. 2). The Vacancy Announcement was issued by OIG's Office of Human Resources in Washington, D.C. (Id.).

McLaughlin himself established the selection processes for the positions (McLaughlin Dep. II at 13-30 & Dep. Exh. 1). He chose the members of panels who interviewed candidates and turned in their recommendations to DOJ OIG Headquarters in Washington, D.C. (Id. at 15 & Dep. Exh. 1 at 1). McLaughlin served as selecting official and, after conferring with the Inspector General, made the final decisions while at his duty station in Washington, D.C. (McLaughlin Dep. II at 29-30 & Dep. Exh. 6, Dep. Exh. 8 at 3; Pendleton Decl., ¶¶5-6). The selection process was in its early stage when McLaughlin received Mr. Haynes' positive assessment of Mr. Pendleton's assignment on two priority cases (McLaughlin Dep. I, Exh. 14; McLaughlin Dep. II, Dep. Exh. 2). Although McLaughlin himself claimed that this assignment was "to show the good faith of the organization," in making the final selections, he gave no consideration to Mr. Pendleton's performance on the assignment (McLaughlin Dep. I at 97-98). Specific allegations about McLaughlin's actions are set forth in the Complaint (at ¶¶28-32, 46). They defeat defendant's motion, because it is premised on defendant's contrary view of the merits. James v. Booz-Allen & Hamilton, Inc., 227 F. Supp.2d 16, 20 (D.D.C. 2002).

## ARGUMENT

## DEFENDANT'S MOTION MUST BE DENIED

The cardinal rule in adjudicating a motion to dismiss on the basis of improper venue or to transfer holds that a plaintiff's factual allegations must be accepted as true, as must all reasonable inferences that can be drawn from them.  E.g., James v. Booz-Allen, supra, 227 F. Supp.2d at 20.  Defendant's motion attempts to side-step this well-established principle by ignoring the detailed allegations in the Complaint, that McLaughlin was intimately involved in discriminating and retaliating against Mr. Pendleton.  Furthermore, and even though they need not be, all of the allegations of the Complaint are corroborated by deposition testimony and exhibits taken and produced in Pendleton I and the EEOC proceeding that preceded this action (McLaughlin Dep. I at 42-54, 88-92, 97-101 & Dep. Exh. 12-13; McLaughlin Dep. II at 13-30 & Dep. Exh. 1, 2, 6-8; Bondurant Dep. at 30 & Dep. Exh. 7-10; Haynes Dep. at 4).

The Complaint specifically details McLaughlin's central role in the employment actions that are at issue in this case.  As it alleged:

> During the pendency of Pendleton I, DOJ OIG assigned Mr. Pendleton to two priority investigations under the direct supervision of Willie Haynes, the only GS-15 African American supervisory Special Agent in its history. DOJ OIG's supposed reason for making the foregoing assignments was to demonstrate its "good faith" in assessing Mr. Pendleton's work and readiness for promotion to Grade 14.  On January 24, 2005, Mr. Haynes praised Mr. Pendleton for having performed "a great job in both" priority investigations in an e-mail directed to Assistant Inspector General for Investigations ("AIGI") Thomas McLaughlin.

> During the same time that Mr. Haynes forwarded his assessment of Mr. Pendleton to AIGI McLaughlin, Mr. McLaughlin opened competition for new nonsupervisory, Senior Special Agent positions at Grade 14.  AIGI McLaughlin also served as the selecting official

> Mr. McLaughlin did not consider Mr. Haynes' evaluation of Mr. Pendleton in the selection process at issue in this case, despite knowing that defendant's purpose in having Mr. Pendleton work under Mr. Haynes' direct supervision was supposedly to demonstrate the agency's "good faith" in considering Mr. Pendleton for promotion.

(Cplt., ¶¶28-32, 46).   The Complaint makes also clear that "venue lies in this judicial district … because defendant's acts of discrimination and retaliation," including McLaughlin's, "occurred in this judicial district" (Id., ¶11).   McLaughlin's own declaration, together with Mr. Pendleton's, removes any doubt about whether he was acting from his duty station in Washington, D.C., when he made the decision to pass over Mr. Pendleton (Pendleton Decl., ¶¶5-6; McLaughlin Decl., ¶1).

## I.    <u>Venue Lies In This District</u>

Title VII contains a special venue provision which is controlling in employment cases. <u>E.g.</u>, <u>Stebbins v. State Farm Mut. Auto. Ins. Co.</u>, 413 F.2d 1100, 1102 (D.C. Cir.), <u>cert</u>. <u>denied</u> 396 U.S. 895 (1969); <u>James v. Booz-Allen & Hamilton, Inc.</u>, 227 F. Supp.2d 16, 21 (D.D.C. 2002); <u>Donnell v. National Guard Bureau</u>, 568 F. Supp. 93 (D.D.C. 1984). In relevant part, it states:

> Each United States district court . . . shall have jurisdiction of actions brought under this title.  <u>Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed</u> . . .

42 U.S.C. §2000-5(f)(3) (incorporated by reference in 42 U.S.C. §2000e-16) (emphasis supplied).   The "inquiry for this venue provision turns on where the allegedly discriminatory decision was made." <u>Johnson v. Washington Gas Light Co.</u>, 89 F. Supp. 2d 45, 46 (D.D.C. 2000); <u>accord</u> <u>Hayes v. RCA Services Co.</u>, 546 F. Supp. 661, 663 (D.D.C. 1982)).   Concrete employment actions, which include denials of promotions, are

acts of "operative significance" that sustain venue.   See James v. Booz-Allen & Hamilton, Inc., supra, 227 F. Supp.2d at 22; Johnson, supra, 89 F. Supp. 2d at 47.

Defendant's goal of trumping Title VII's venue provision rests entirely on McLaughlin's own Declaration, which goes to the merits of this case (Def. Mot. at 5). But doing so contradicts the specific allegations of the Complaint, not to mention the extensive record compiled earlier.   It also contravenes the most basic rule in determining whether venue is correct:   namely, accepting the allegations of a complaint and all of the reasonable inferences to be drawn from it as true.   James v. Booz-Allen & Hamilton, Inc., 227 F. Supp.2d 16, 20 (D.D.C. 2002).   The Complaint in this action undeniably contains specific allegations supporting venue in this judicial district, which defeats defendant's motion (Cplt., ¶¶28-32, 46).[3]

## II.    Defendant Has Not Borne Its Burden To Transfer This Case

Defendant has tacitly admitted that its motion is poorly grounded on improper venue, by arguing in the alternative that this case should be transferred to the Eastern District of Virginia under 28 U.S.C. §2404(a) ""[f]or the convenience of the parties and witnesses" and "in the interest of justice" (Def. Mot. at 8).   A defendant seeking to transfer a case must bear the burden of showing that the overall interests of justice – and not just its own interests – would be served by a transfer.   Sheraton Operating Corp. v. Just Corporate Travel, 984 F. Supp. 22, 26 (D.D.C. 1997); accord, Gemological Institute of America v. Thi-Dai Phan, 145 F. Supp. 2d 68, 71 (D.D.C. 2001).   Defendant's invitation to turn a neighboring federal court into a dumping ground should be resisted.

---

[3]    Dismissing a Title VII action on the ground of improper venue instead of transferring it is not appropriate.   James, supra, 227 F. Supp.2d at 22.   As explained in note 2, supra, doing so would operate as a dismissal with prejudice.   29 C.F.R. §§1614.302, 1614.310.

The convenience of parties and witnesses will most certainly not be advanced by a transfer.  McLaughlin's office is exactly three blocks from the office of plaintiff's counsel, according to Google Maps.  Defendant's Washington Field Office is located only 3.5 miles away, according to the same source.  Since "the balance of convenience of the parties is" not "strongly in favor of defendant," this case cannot properly be transferred.  Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3rd Cir. 1970), cert. denied 401 U.S. 1910 (1971) (citing and quoting Owatonna Manu. Co. v. . Melroe Co., 301 F. Supp. 1296, 1307 (D. Minn. 1969); Everprest, Inc. v. Phillips-Van Heusen Corp., 300 F. Supp. 757 (M.D. Ala. 1969) (emphasis in original); accord Sheraton Operating Corp. v. Just Corporate Travel, 984 F. Supp. 22, 26 (D.D.C. 1997)

"Ordinarily, the 'plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request.'"  Sheraton, supra, 984 F. Supp. at 25) (citing, among other authorities, Shutte, supra, 431 F.2d at 25.  Although this factor is entitled to less weight because Mr. Pendleton is a resident of Silver Spring, Maryland, Boers v. United States, 133 F. Supp. 2d 64, 65 (D.D.C. 2001); there is no countervailing reason for discarding the basic principle of transfer that his "choice . . . should not be lightly disturbed." Shutte, 431 F.2d at 25 (citing and quoting Handlos v. Litton Industries, Inc., 304 F. Supp. 347, 352 (E.D. Wisc. 1969); Ungrund v. Cunningham Brothers, Inc., 300 F. Supp. 270, 272 (S.D. Ill 1969); accord, Sheraton, supra, 984 F. Supp. at 26.  An important relevant factor, i.e., namely in having a federal court in this jurisdiction adjudicate the propriety of the actions of senior law enforcement officials who work here, weighs heavily against transfer.  Wilderness Society v. Babbitt, 104 F.Supp. 2d 10, 12 (D.D.C. 2000).  Other relevant factors include ease of access to evidence and availability of

witnesses; they are neutral at best.  Id.  The short of this matter is that transfer has nothing

to commend it, except for promoting defendant's poorly-disguised and utterly private

interest in getting this case out of Washington, D.C.


## **<u>CONCLUSION</u>**


For the foregoing reasons, plaintiff respectfully submits that defendant's motion

to dismiss, or in the alternative, to transfer must be denied.


Respectfully submitted,



_____/s/_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100



_____/s/_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767
Robert C. Seldon & Associates, P.C.
1319 F Street, N.W.
Suite 305
Washington, D.C.  20004
(202) 955-6968
Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK A. PENDLETON,      )
             )
      Plaintiff,      )
             )
     v.         )      Civ. Action No. 07-1884 (JDB)
             )
MICHAEL B. MUKASEY,    )
Attorney General,     )
             )
      Defendant.    )
_____)

## DECLARATION OF MARK A. PENDLETON

I, Mark A. Pendleton, being duly sworn, due hereby depose and state as follows:

1.)     My name is Mark A. Pendleton.  I am the plaintiff in this action and make this Declaration to support my opposition to defendant's motion to dismiss or, in the alternative, to transfer this action.

2.)     I am a GS-13 1811, African American Special Agent or Criminal Investigator. My employing agency is the Office of Inspector General ("OIG") of the Department of Justice ("DOJ" or "the agency").  My duty station is the DOJ OIG its Washington Field Office ("WFO").

3.)     I was also the plaintiff in Pendleton v. Gonzales, Civil Action No. 04-1838 (DDC) ("Pendleton I"), appeal pending, No. 05- (D.C. Cir.) in which I alleged that I was discriminated against on account of my race in being denied promotion to GS-14 in August of 2003.

4.)     DOJ OIG was commissioned as an Inspector General's Office in 1989.  Like all Offices of Inspectors' General, DOJ OIG has a highly specialized function.  Beyond its general

mission of promoting economy, efficiency and effectiveness within DOJ, DOJ OIG's activities focus exclusively on white collar crime and misconduct and include conducting investigations into violations of federal criminal and civil law, regulation, and ethical standards, and into suspected fraud, waste, abuse, and misconduct, committed against and within DOJ and its components. I joined DOJ OIG when it was first established and, since 2002, have received three substantial Inspector General's Awards for Sustained Superior Performance, among other honors.

5.)    The Headquarters of DOJ OIG is in Washington, D.C.; and the Investigation Division is located at 1425 New York Avenue, N.W. Washington, D.C., is the duty station of all senior officials of DOJ OIG, including Inspector General Glen Fine, Assistant Inspector General Thomas McLaughlin, and Willie Haynes, the African American Special Agent in Charge of DOJ OIG's Investigative Support Unit under whose supervision I was specially assigned to perform two complex, priority investigations.

6.)    This case concerns my being denied promotion to GS-14 in May of 2005. The selecting official, Thomas McLaughlin, was stationed in Washington, D.C., when he made the decision not to select me, and that is where he was acting when he passed me over for promotion.

7.)    In order to assess my performance free from my then-supervisor's influence, a manger who had played a principal role in discriminating against me, then-AIGI T.J. Bondurant and current AIGI Thomas McLaughlin assigned me to conduct two priority investigations under the supervision of Mr. Haynes.

8.)    This assignment under Mr. Haynes was suggested by the agency and carried out by the agency after it was proposed in settlement talks in Pendleton I that were unsuccessful.

9.)     The supposed purpose of this assignment was to demonstrate the agency's "good faith" about considering me for promotion.

10.)     Mr. Haynes, the only African American manager in DOJ OIG, reported back to AIGI McLaughlin that I had performed "a great job in both" cases.  To my knowledge, AIGI McLaughlin never took any positive employment action toward me as a result of this assessment of my abilities and did not consider it during the selection process at issue in this case.

11.)     My extensive experience in DOJ OIG priority investigations exceeded the selectees' in the promotion action at issue in this case in every respect.

12.)     I had handled 16 priority cases through to conclusion before being passed over. As recently as a few months before their selection, neither of the selectees had completed and closed even one.

13.)     Neither of the agents selected instead of me for promotion had received DOJ awards of the caliber of my three IG Awards, which were in amounts equal to or in excess of $2000.00.  Each of them had received one rather minor cash award in the amount of $306.04.

14.)     When they were selected, neither selectee had a year's service with DOJ OIG, and had only received 90 day appraisals.

15.)    When they were selected, neither selectee had any experience in investigating white collar crime and internal misconduct investigations before being hired by DOJ OIG the previous year.

I hereby declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Mark A. Pendleton
Executed on February 8th, 2008.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -X

MARK A. PENDLETON,              :

       Plaintiff       :

     v.                      : No. 04-1838(RJL)

                           :

JOHN ASHCROFT,                  :

       Defendant       :

- - - - - - - - - - - - - -X

DEPOSITION OF THOMAS MC LAUGHLIN

Washington, D.C.

Tuesday, August 15 2006

Deposition of THOMAS MC LAUGHLIN, called for examination at 1:35 p.m., at the law offices of Robert C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite 305, Washington, D.C., before Gary S. Howard, a notary public in and for the District of Columbia, when were present on behalf of the respective parties:

1      APPEARANCES:

2          On behalf of the Plaintiff:

3              ROBERT C. SELDON, Esq.

4              Law Offices of Robert C. Seldon, P.C.

5              1319 F Street, N.W.,

6              Suite 305

7              Washington, D.C.  20004

8

9          On behalf of the Defendant:

10             JOHN F. HENAULT, Jr., Esq.

11             United States Department of Justice

12             United States Attorney's Office

13             555 4th Street, N.W.,

14             Washington, D.C.  20530

15             (202-307-1249)

16             GAIL ROBINSON, Esq.

17             General Counsel

18             Office of Inspector General, DOJ

19

20    Also present:

21

22             MARK PENDLETON

1                    C-O-N-T-E-N-T-S

2 WITNESS                          EXAMINATION

3 Thomas McLaughlin                        4

4

5

6

7

8

9

10                    E-X-H-I-B-I-T-S

11 NUMBER                          IDENTIFICATION

12 Deposition Exhibit No. 12              74

13 Deposition Exhibit No. 13              75

14 Deposition Exhibit No. 14              100

15     (Exhibits furnished by Mr. Seldon.)

16

17

18

19

20

21

22

Page 4

1                   P-R-O-C-E-E-D-I-N-G-S

2 Whereupon,

3                   THOMAS MC LAUGHLIN

4 was called as a witness and, having been first duly

5 sworn, was examined and testified as follows:

6                   EXAMINATION

7          BY MR. SELDON:

8    Q     Mr. McLaughlin, good afternoon.

9    A     Good afternoon.

10   Q     Thank you for coming. For the record,

11 would you please give us your full name?

12   A     Thomas F. McLaughlin.

13   Q     Mr. McLaughlin, I take it that you are

14 currently employed by the Department of Justice.

15   A     That's correct.

16   Q     In what capacity?

17   A     I'm the assistant inspector general for

18 investigations.

19   Q     With the office of inspector general?

20   A     Office of inspector general, Department

21 of Justice.

22

1 body of cases designated as priority investigations

2 in which some types of priority investigations were

3 more or less important than other types of priority

4 investigations?

5    A    No, there was no distinction.

6    Q    Okay.

7    A    At that time.

8    Q    Has there been one after '04?

9    A    Yes.

10   Q    What's that?

11   A    We no longer automatically designate FBI,

12 DEA and ATF -- pretty much no longer designate any

13 case priority until we confer with the inspector

14 general and he agrees that it should or should not

15 be priority.

16   Q    Okay.

17        MR. SELDON:  Let me collect my notes and

18 see if we can skip some of this.

19        (Pause.)

20        BY MR. SELDON:

21   Q    Let me show you a document that was

22 marked previously as Exhibit 4, and you can use it

Page 50

1 as a point of reference. It's Exhibit 4 to the

2 depositions, okay?

3          And this is most, if not all, of Mr.

4 Johnson's application for a senior special agent

5 position that he submitted in the summer of 2003,

6 when he was picked for one of those positions.

7          Okay?

8     A     Yes, sir.

9     Q     And what I'm going to do is I'm going to

10 ask you to go, let's say to the second page from

11 the back.

12          It's a memorandum and Mr. Bondurant has

13 already identified it, dated June 10th, 2002, when

14 it is informing Mr. Johnson that he was the

15 recipient of a bonus and/or award recognizing his

16 superior performance.  And the amount was $2100.

17          Okay?

18     A     Yes.

19     Q     The first thing I want to ask you is,

20 what, if anything, do you know about the process of

21 which an award such like this is given, or decided

22 upon?

1     A     This is an inspector general award. And

2 it would occur based on the evaluation process of

3 the agents, which occurs every year, although the

4 timing of that has changed.

5           Back in '02, I think it would have been

6 in the springtime.

7           The inspector general designates an

8 amount of money that he assigns as an award pool

9 and he provides a certain portion of that money to

10 each division.

11          Then each division's AIG will accept

12 nominations for awards from the field office SACs,

13 the special agents in charge.

14    Q     Okay. And then?

15    A     And then a decision is made by the

16 assistant inspector general as to which awardees

17 will receive the award and what amount they will

18 receive, within certain parameters.

19          The administrative side of the house sets

20 certain guidelines for grade levels and certain

21 levels of dollar amount.

22    Q     Okay. So, if I take it, you correct me if

Page 52

1 I'm wrong, the assistant inspector general for

2 investigation makes a decision as to which agents

3 will get which awards, I take it.

4          Is that the idea?

5    A    Submits that to the inspector general,

6 who concurs, does not concur. And the awards are

7 then processed through personnel to ensure that

8 they meet all of the personnel efficiency or

9 standards, and the award is granted at that point.

10   Q    Okay. So the first thing we know about

11 this award for Mr. Johnson is that it's an award

12 from the inspector general.

13         Is that right?

14   A    Correct, from the office of the inspector

15 general.

16   Q    I guess what I'm saying is wrong. I

17 thought you said, ultimately, the inspector general

18 has to approve the award.

19   A    He does.

20   Q    Okay. So it's got to be made -- this

21 award had to be made -- this award to Mr. Johnson,

22 the performance award, had to be made or approved

Page 53

1 by the inspector general?

2    A    It would not have been granted without

3 his concurrence, that's correct.

4    Q    Okay. And then you said the assistant

5 inspector general makes --

6    A    I may have confused it. The special agent

7 in charge makes the recommendations.

8         The assistant inspector general concurs,

9 denies, makes a decision for the entire division.

10    Q    Okay.

11    A    Presents that decision for concurrence by

12 the inspector general. It's then verified by the

13 management and planning division for sufficiency.

14         In other words, that the award meets

15 OPM's standards, and the award is granted.

16    Q    An award like this, a performance award

17 in the sum of $2100, is that an important award, or

18 was it in June of 2002?

19         MR. HENAULT:  Object to the form. Go

20 ahead and answer, sir.

21         THE WITNESS:  I would say yes.

22         BY MR. SELDON:

Page 54

1    Q     Would it be fair to say that, based on

2 your knowledge, it's one of the most important

3 awards given out in the office of inspector

4 general, investigation division?

5          MR. HENAULT:  Object to the form. Go

6 ahead and answer, sir.

7          THE WITNESS:  As far as a monetary award,

8 there are some that are higher level than this as a

9 performance award.

10          But it's still a very significant award,

11 I believe.

12          MR. SELDON:  Okay.

13          BY MR. SELDON:

14    Q     And you talked about the role of the

15 assistant inspector general making or being

16 involved in the decisional chain as to which agents

17 would get or not get such an award.

18          The assistant inspector general in June

19 of '02 was Mr. Bondurant, I take it.

20    A     Correct.

21    Q     And you were his deputy at the time.

22    A     Correct.

Page 88

1    A    That would involve discussions with the

2 general counsel.

3            MR. SELDON:  Well, John, where do we go

4 from here?  Are you telling him not to answer?  If

5 not, I'll continue.

6            MR. HENAULT:  Let's go off the record for

7 a second.

8            MR. SELDON:  Sure.

9            THE COURT REPORTER:  We're off the

10 record.

11            (Discussion off the record.)

12            THE COURT REPORTER:  We're back on the

13 record.

14            MR. SELDON:  What I'm going to do, Mr.

15 McLaughlin, with Mr. Henault's concurrence, I'm

16 just going to sort of lead you in the first couple

17 of areas because what I want to do is steer you

18 away from things that we don't really care about,

19 that might somehow -- I can't think of the word

20 today.

21            MR. HENAULT:  Implicate the privilege.

22            MR. SELDON:  Implicate.

Page 89

1          MR. HENAULT:  Potentially.

2          MR. SELDON:  What a ridiculous word.

3 What's the word for making an incursion?

4          I don't know.

5          BY MR. SELDON:

6    Q     What we're trying to say is, I take

7 it -- correct me if I'm wrong -- that you and/or

8 Mr. Bondurant came up with the idea of assigning

9 Mr. Pendleton to work under the supervision of Mr.

10 Haynes on two cases.

11          Is that right or wrong?

12    A     I don't know whose idea it was, to be

13 honest with you.

14    Q     Okay. Would it be fair, then, to say that

15 you and/or Mr. Bondurant made the managerial

16 decision that Mr. Haynes would supervise Mr.

17 Pendleton on two cases?

18    A     Yes.

19    Q     And those were two priority cases?

20    A     Yes, they were.

21    Q     What was the purpose of doing that, as

22 you understood it?

Page 90

1          MR. HENAULT:  As you understood that, you

2 can answer the question, sir.

3          THE WITNESS:  As I understood it, there

4 was an effort to resolve the matter that we're here

5 today discussing.

6          MR. SELDON:  Okay.

7          THE WITNESS:  And that part of a proposed

8 agreement that was made by the agency to Mr.

9 Pendleton was that he be assigned two priority

10 investigations and that he complete them

11 successfully within the timeframes allotted, et

12 cetera, and that he would then be promoted to a

13 Grade 14, senior special agent in an office other

14 than WFO, in return for which Mr. Pendleton would

15 drop his suit.

16          MR. SELDON:  Okay.

17          BY MR. SELDON:

18    Q    So, then, there were at least two

19 components to this. One that Mr. Pendleton would

20 successfully complete two priority investigations,

21 I take it.

22    A    Correct.

1    Q      And the other was that he would do it in

2 a timely manner.

3    A      Correct.

4    Q      Did he successfully complete these two

5 investigations?

6    A      In my opinion, yes.

7    Q      And did he successfully complete them in

8 a timely manner?

9    A      It took well over a year. These were very

10 complicated investigations, as I remember them.

11          If you go strictly by the guidelines, no,

12 that would not have been timely. However, as I

13 said, these were very complicated investigations.

14 And one of them actually involved the courts. So,

15 therefore, he couldn't have been held responsible

16 for that timeframe.

17    Q      Okay. So in terms of the practicalities,

18 then, is it correct to say that he was timely?

19    A      I didn't find it to be untimely at the

20 time.

21    Q      Okay.

22    A      I have no recollection of having viewed

Page 92

1 it that way.

2    Q    And why was the selection of Mr. Haynes

3 made?

4    A    We wanted someone who was not in Mark's

5 chain of command, someone who we had faith in

6 there, their individual ability and investigative

7 ability, which Mr. Haynes fit.

8            And somebody that knew Mark.

9    Q    Okay.

10    A    That was willing to take on this very

11 difficult -- not difficult -- but sort of an

12 awkward assignment.

13    Q    Okay.

14    A    Willie agreed to do it. I would like to

15 add to one of my previous answers.

16    Q    Sure.

17    A    That it is my understanding that the

18 agreement was never -- that Mr. Pendleton never

19 agreed to the proposed agreement by the agency.

20    Q    Right.

21    A    That, in effect, there was no agreement

22 in place when this assignment took place.

 1          I'm trying to find out if he understands

 2 why this assignment was made. And I don't really

 3 want him to tell me that the counsel did or didn't

 4 tell him.

 5          MR. HENAULT:  Do you have an

 6 understanding -- let me ask. Do you have an

 7 understanding of why that decision --

 8          MR. SELDON:  Why the assignment.

 9          MR. HENAULT:  Why the assignment went

10 forward?

11          THE WITNESS:  I think I have an idea.

12          MR. SELDON:  Okay.

13          THE WITNESS:  An understanding. I have an

14 idea.

15          BY MR. SELDON:

16    Q    Okay. What was your idea?

17    A    I believe it was to show the good faith

18 of the organization.

19    Q    Okay. That's fair enough. And do you know

20 in what way?

21          MR. HENAULT:  Object to the form of the

22 question. You can answer, sir.

Page 98

1          THE WITNESS:  This was part of an

2  agreement that was being, as I understood, was

3  being proffered.  And so, in good faith, the agency

4  proceeded with our element of that nonagreement.

5          MR. SELDON:  Okay.

6          BY MR. SELDON:

7    Q    And did you understand one way or another

8  when these assignments were done, that anything was

9  going to happen?

10   A    My understanding was that nothing would

11 happen.

12   Q    And so, how does that show your agency's

13 good faith?

14         MR. HENAULT:  Object to the form of the

15 question. You can answer, sir.

16         THE WITNESS:  I don't know how it shows

17 good faith.

18         MR. SELDON:  Okay. What number are we up

19 to, Gary?

20         THE COURT REPORTER:  This will be 14.

21              (The document referred to

22               was marked for identification

1              as Deposition Exhibit No. 14.)

2          BY MR. SELDON:

3     Q     Mr. McLaughlin, can I ask if you can

4 identify this document?

5     A     This is an e-mail to me and George

6 Dorsett from Willie Haynes, dated January 24th,

7 2005.

8     Q     Okay. And I take it it concerns the two

9 priority investigations that Mr. Pendleton worked

10 on under Mr. Haynes' supervision.

11    A     Yes, it does.

12    Q     To your knowledge -- do you have any

13 reason to believe that this did not accurately

14 summarize Mr. Pendleton's performance on those two

15 cases?

16    A     No, I have no reason to question Willie's

17 overall judgment of Mark's performance.

18    Q     So when you got this e-mail, did you know

19 that this was Mr. Haynes' opinion before you got

20 the e-mail?

21    A     I don't think so. I don't recall.

22    Q     Okay. So now you got the e-mail and you

1 have Mr. Haynes' opinion.

2          Did you call Mr. Haynes?

3    A    No.

4    Q    Did you communicate with him?

5    A    No.

6    Q    On this subject, I meant.

7    A    No.

8    Q    Did you talk to Mr. Dorsett about this

9 subject?

10   A    Probably.

11   Q    Any recollection?

12   A    No.

13   Q    Do you know if -- do you remember

14 anything that Mr. Dorsett told or communicated to

15 you?

16   A    No.

17   Q    Do you know if Mr. Dorsett communicated

18 with Mr. Haynes, other than this e-mail?

19   A    I don't know. I don't think so, but I

20 don't know.

21   Q    Do you know if Mr. Haynes communicated

22 with Mr. Dorsett?

1    A    I don't know.

2    Q    What did you do in response to getting

3 this e-mail?

4    A    Nothing.

5    Q    Why?

6    A    As I said, this was part -- as I

7 understood it,  that this was an element of an

8 agreement that was attempted by the agency with Mr.

9 Pendleton to resolve the matter at hand.

10        Mr. Pendleton chose not to accept the

11 agreement. Therefore, there was no basis in fact

12 for me to act at all.

13        I had no authority to act, based on this.

14 This was a successful completion of two

15 investigations that were well within the

16 responsibility of a special agent of Mr.

17 Pendleton's caliber to complete.

18    Q    I think you told me that giving him this
   assignment was to demonstrate the agency's good
19 faith.
      A    I told you that was my guess, that's
20 correct.
      Q    Okay.
21        MR. SELDON:  I don't think we have
   anything more.
22        Anything you've got?

**U.S. Department of Justice**

Office of the Inspector General

_____

*Washington, D.C. 20530*

December 7, 2005

MEMORANDUM FOR MARK A. PENDLETON
                  SPECIAL AGENT
                  WASHINGTON FIELD OFFICE

FROM:           THOMAS F. MCLAUGHLIN
                  ASSISTANT INSPECTOR GENERAL
                  FOR INVESTIGATIONS

SUBJECT:      <u>Performance Award</u>

       I am pleased to inform you that you have been awarded a performance bonus of $2,200 to recognize your superior performance and dedication to the mission of the Office of the Inspector General (OIG) and the Investigations Division during the most recent performance rating period. This award will be deposited electronically to your account the week of December 22, 2005.

       You have distinguished yourself by the quality of your work during the past year and in doing so have brought distinction to the OIG. I am extremely proud of the work that you, our Division, and the OIG have done and will continue to do to advance the mission of the Department of Justice. Please accept my sincere appreciation for your hard work and professionalism during this past year of challenges and new demands. Congratulations on this award.



DEPOSITION
EXHIBIT
#12
McLaughlin
PENGAD 800-631-6989

U.S. Department of Justice
Office of the Inspector General

**Award Recommendation and Approval Form**

## EMPLOYEE INFORMATION

| | |
|---|---|
| **Employee:**<br>Mark A. Pendleton | **Grade:**<br>GS/GM __13__  Step __9__  Job Series __1811__ |
| **Social Security No.: 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** | **Overall Rating:** ☐ Outstanding  ☑ **Excellent** |
| **Division/Office/Location:**<br>**INV / Washington Field Office** | **Award Type:** ☑ **Sustained Superior Performance**<br>☐ **Special Act/Achievement** |

## JUSTIFICATION

*(Rating Official must provide succinct justification for the value of Performance/Act/Achievement to the Division/Office or DOJ.)*

During this rating period, SA Mark A. Pendleton has performed his assigned duties in an excellent manner during this evaluation period. He continues to be a dedicated, experienced investigator who has conducted a variety of investigations, including Priority and congressional interest cases, during this rating period.

SA Pendleton conducted a congressional interest case involving allegations that a Bureau of Prisons (BOP) supervisory corrections officer sexually abused a female inmate at the FCI Gilmer, West Virginia. SA Pendleton responded with a thorough, timely investigation which found the allegation to be unsubstantiated and exonerated the supervisory corrections officer. SA Pendleton conducted a sensitive investigation into allegations that an employee of the U.S. Parole Commission had destroyed incoming documents from other Government components. SA Pendleton conducted numerous interviews over a short time frame due to the sensitivity of the case, although not substantiating the allegations. Additionally, SA Pendleton completed a number of other investigations to include an FBI whistleblower investigation; the conviction of an Assistant U.S. Attorney for failure to pay child support; and the 60-day suspension of an FBI employee for stealing FBI technical supplies. SA Pendleton has assisted other Washington Field Office agents in a number of investigations involving the FBI, the Marshals Service, and the BOP. He has also conducted Integrity Awareness Briefings for BOP personnel.

SA Pendleton maintains a professional, cooperative demeanor in his dealings within and outside of the OIG. He readily assists his colleagues with their investigations, and willingly accepts new assignments, positively contributing to organizational goals.

☐ **Nomination for IG Honor Award** *(Optional by AIG. Please provide concise ci_____ _____ separate page).*

☐ **Nomination for IG Merit Award** *(Optional by AIG. Please provide concise cit_____ _____ parate page).*

DEPOSITION
EXHIBIT
#13
McLaughlin

## DIVISION APPROVALS

| **Approval of Office Supervisor:** | **Approval of Office Head:** |
|---|---|
| | **AWARD AMOUNT** $ _2200_ |
| Rating Official _____ *ASAC* Date 11-15-05 | Signature _Thomas F. McLaughlin_ (flb) |
| Reviewing Official _____ Date 11-15-05 | Title _AIGI_   Date: 11/7/05 |

## To be Completed by M&P Division

| **HR Review:** | **Funding Review and Authorization:** |
|---|---|
| _Wanda Jo Oliver_   12/7/05 | |
| OHR Representative          Date | _____  _____ |
| | Financial Officer          Date |

**McLaughlin, Thomas F. (OIG)**

| | |
|---|---|
| **From:** | Haynes, Willie (OIG) |
| **Sent:** | Monday, January 24, 2005 5:23 PM |
| **To:** | McLaughlin, Thomas F. (OIG); Dorsett, George L. (OIG) |
| **Subject:** | 2004000085/2004001267 |

Tom/George:

    FYI

      As you may recall, back in December 2003, T.J. asked me to supervise the above cases assigned to Mark Pendleton. Both cases have been resolved and no further investigation is anticipated on either matter. 0085 is the FBI Whistleblower case and the final ROI has been prepared and the case is closed. 1267 is the EOUSA case and the subject (Oscar Mayers) has pled guilty to a 1001 count and has retired from the USAO. His sentencing is scheduled for April 2005.

      Mark did a great job on both of these cases. If we need to discuss further, pls. let me know.

Thanks

-wh-

DEPOSITION
EXHIBIT
#14
McLaughLin

1/24/2005

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE


MARK A. PENDLETON,            )

          Complainant,        )

v.                            ) EEOC No.

ALBERTO GONZALEZ,             ) 570-2006-00514X

Attorney General             ) Agency No.

United States Department      ) B-05-2536

of Justice,                   )

          Agency.             )

                    *      *      *      *      *



          The deposition of THOMAS McLAUGHLIN was

taken on Thursday, December 14, 2006, commencing at

9:21 a.m., at the offices of Robert C. Seldon &

Associates, P.C., 1319 F Street, N.W., Suite 305,

Washington, D.C., before Dawn M. Cain, Notary

Public.

                    *      *      *      *      *

Page 2

1                A P P E A R A N C E S

2 ON BEHALF OF THE COMPLAINANT:

3        ROBERT C. SELDON, ESQUIRE

4        Robert C. Seldon & Associates, P.C.

5        1319 F Street, N.W.

6        Suite 305

7        Washington, D.C.  20004

8        (202) 955-6968

9        (202) 842-1418 - fax

10

11 ON BEHALF OF THE AGENCY:

12        STEVE H. FALLOWFIELD, ESQUIRE

13        U.S. Department of Justice

14        950 Pennsylvania Avenue, N.W.

15        Washington, D.C.  20530

16        (202) 616-0633

17        Steve.H.Fallowfield@usdoj.gov

18

19 ALSO PRESENT:

20        MARK PENDLETON

21

1                    I N D E X

2          DEPOSITION OF THOMAS McLAUGHLIN

3               DECEMBER 14, 2006

4 EXAMINATION BY:                    PAGE

5 Mr. Seldon                         4

6 Mr. Fallowfield                    42

7

8 DEPOSITION EXHIBITS:               PAGE MARKED

9 No. 1 through 2                    5

10 No. 3 through 4                   6

11 No. 5                             31

12 No. 6                             33

13 No. 7                             35

14 No. 8                             41

15

16

17

18

19

20          P R O C E E D I N G S

21          -     -     -     -     -

1 Whereupon --

2                THOMAS McLAUGHLIN,

3 a witness, called for examination, having been

4 first duly sworn, was examined and testified as

5 follows:

6                EXAMINATION

7      BY MR. SELDON:

8   Q.   Mr. McLaughlin, thank you for coming down.

9 The first thing I want to do -- well, let me just

10 say this, I know we want to be as efficient today

11 as we can.  We took your deposition in

12 Mr. Pendleton's first case not very long ago.

13      I am going to spare you the ground rules

14 today and the time unless you or Mr. Fallowfield

15 feel there is some need to go over them again.

16   A.   Not at all.

17   Q.   We used and with Mr. Fallowfield's agreement

18 several exhibits yesterday and we are going to use

19 these and some more with you this morning and with

20 Mr. Johnson this afternoon.  I just want you to

21 know I'll put these here if you need to refer to

1 agent positions?

2    A.    There had been some direction prior to the

3 2003 selections as to an interview process.  I

4 don't -- I would have to refresh my memory with

5 looking at documentation, but there had to have

6 been some announced that then went out to the field

7 offices telling them what they were to do relative

8 to the 2003 selections.

9          This was a further definition or a further

10 refinement or expansion or change to that

11 procedure.

12    Q.    And then this as far as we are concerned,

13 Exhibit 1 dated December 17th, 2004, was the

14 procedure to be used in, I guess, the selections

15 that were happening -- was it -- has it ever

16 changed after --

17    A.    No, it has not.

18    Q.    Let's now work backwards for a minute if you

19 can.  When we work on them, we are going to work on

20 the three bulleted paragraphs.  The first two are

21 on page 1 and the second is on page 2.

1      It talks here about a three-member panel

2 being selected to interview candidates and what I

3 would like to find out if you know one way or

4 another is before the panel members -- panel did

5 its work, was there any screening of candidates by

6 anyone in the panel, personnel department or

7 anyone?

8   A.   Well, I can't speak to the personnel

9 department, but my understanding is, no, there were

10 not.  Anyone who applied for the position was

11 presented to the panel for an interview and all

12 applicants were interviewed.

13   Q.   So as I understand to explain it, but the

14 first panel member we deposed didn't know and that

15 is the only reason we raised it with you.  So now

16 let's deal with the first bulleted paragraph on

17 page 1.  Actually we won't get that far.  There's a

18 three member panel?

19   A.   Correct.

20   Q.   I take it there were a number of positions

21 around the country in your organization that were

Page 15

1 advertised as senior special agent positions at or

2 about the same time in 2005?

3  A.    Correct.

4  Q.    There were -- correct me if I'm wrong --

5 different panel members for each of those

6 selections?

7  A.    Correct.

8  Q.    How were panel members for each of those

9 selections chosen?

10   A.    I selected them and what this document does

11 is it establishes the nature of the panel and that

12 is that the panel will consist of three managers,

13 one of which will generally be the agent in charge

14 of the field office where the vacancy exists.

15       Another will be a headquarters manager and

16 another will be another field office manager.  As

17 to the specific names I selected them based on a

18 variety of criteria, based on what their experience

19 had been, where they had worked previously, where

20 they were physically located.  There was some

21 travel considerations here as well, so...

Page 16

1   Q.   I think Mr. Oleskowicz said he had been

2   submitted by video so I don't want to pin you down

3   on travel arrangements or anything.

4   A.   Right.

5   Q.   So in this particular case in so far as the

6   WFO was concerned, we have Mr. Huggins, Mr. Johnson

7   and Mr. Oleskowicz, and I take it from your

8   testimony you had decided that these were the three

9   who would sit on the panel?

10  A.   Correct.

11  Q.   Huggins being the special agent in charge of

12  the Washington Field Office where the position

13  would be located?

14  A.   Correct.

15  Q.   Johnson being a headquarters official?

16  A.   Correct.

17  Q.   Mr. Oleskowicz being another field official?

18  A.   ASAC in Chicago, correct.

19  Q.   Johnson was -- he used -- did you select him

20  to participate in more than one of these panels, if

21  you recall.

1   A.   I don't believe so.

2   Q.   Do you recall?

3   A.   I believe each panel was different.

4   Q.   How many just if you could tell us not so

5 much by name, but by body how many were units in

6 your organization?  How many headquarters officials

7 were there who could potentially serve on these

8 panels?  I mean I guess you had special operations

9 as one possible source?

10   A.   Right.  It would have to have been a grade

11 14 or a grade 15.  I mean my intent when I said a

12 manager it would be a --

13   Q.   Oh, it wasn't a division head.  Okay.

14   A.   No, it would have been either an ASAC or a

15 SAC depending on availability, et cetera.

16   Q.   Just so you understand 'cause I want to move

17 this as quickly as we can for your sake.  I didn't

18 see how there were enough organizations to have

19 only head of each unit participate, but once you

20 said special agent in charge and this is the

21 special agent in charge -- your expectation was

1 that the panel would get and each of the members

2 would get the application package or no?

3    A.    Yes.

4    Q.    The written application package?

5    A.    Yes.

6    Q.    Did you have an understanding that the panel

7 members would look at or evaluate those packages

8 before they met as a panel?

9    A.    Before they conducted the interviews, yes, I

10 expected that they would review the applications.

11    Q.    Individually or as a group?

12    A.    Individually at least.

13    Q.    Was your expectation then that there would

14 be some group discussion or consideration of the

15 written materials before the interviews?

16    A.    I can't say that I had that expectation, but

17 I wouldn't be surprised that it occurred.

18    Q.    Okay.  So just to summarize 'cause I want to

19 move through some of these important areas, you

20 didn't necessarily have an expectation that they

21 would -- the panel members would consult with one

1 another about the written materials, but neither

2 would you have considered it out of line if they

3 did?

4    A.    Absolutely.

5    Q.    Now, we are in the interview process and I

6 take it your expectation was that all three panel

7 members would participate?

8    A.    Correct.

9    Q.    That there would be a series of questions

10 that would be given to all of the panels conducting

11 the interviews?

12    A.    There were 25 questions that were created

13 and provided to all of the offices and they were

14 instructed to use these questions.  We later -- I

15 later modified this.

16        I don't recall exactly how I told them to

17 use 12 or 13 questions, something like that, not

18 the full 25, which would have just taken too long,

19 but they were to use the same questions for every

20 applicant.

21    Q.    Each panel would use the same questions for

 1 every application?

 2   A.   Correct.   That's correct.   The panels --

 3 correct.   You are right.   The panels could have

 4 selected different questions from the 25, but they

 5 would have -- that panel would then ask all

 6 applicants for that job the same questions.

 7   Q.   Did you have an expectation that one person

 8 on the panel would ask the questions and everyone

 9 would listen or anything one way or another?

10   A.   I didn't have any expectation.

11   Q.   The point was simply -- the point was that

12 each panel would ask some or all of the questions

13 out of the 25 of all of the candidates each

14 grouping --

15   A.   The same -- it's exactly the same set of

16 questions.

17   Q.   Was your understanding and expectation then

18 that these would be evaluated in any sort of way?

19   A.   The questions?

20   Q.   The answers.

21   A.   The answers, absolutely.

1   Q.    How did you expect them to be evaluated?

2   A.    I expected them to then come to assess

3 individually the responses from the applicants in

4 terms of their thoroughness or how they -- the

5 applicants presented the answers and then how each

6 panel member felt about those answers and then

7 collectively come to a consensus on who did the

8 best job in terms of providing the answers to the

9 questions and rating and ranking each of the

10 applicants accordingly.

11  Q.    Okay.  Let's just go back and separate this

12 a bit.  When you said you expected, I think, the

13 panel members to evaluate the responses given by

14 each of the candidates, are you with me there?

15  A.    Yes.

16  Q.    Did you have an expectation one way or

17 another that the panel members would do this

18 individually or that they would do it as a group?

19  A.    I didn't lay it out specifically one way or

20 the other.  What my intent would be is that each

21 panel member would evaluate the candidates

Page 22

1 themselves individually and that then they would

2 discuss as a group all of the interviews that they

3 had conducted and try to come to some consensus on

4 who was the best candidate to present to me.

5    Q.    You mention the rankings of candidates, I

6 think.  How did you anticipate that working?

7    A.    First of all, I wanted every applicant

8 interviewed and I wanted all applicants presented

9 on a memorandum to me in rank order with their

10 strengths and weaknesses and some delineation of

11 why particular candidates were ranked higher than

12 other candidates.

13    Q.    How did you expect the panel members to come

14 up with this rank order that would be presented to

15 you?

16    A.    Well, I expected that each one would

17 individually rank the candidates.  That was the

18 purpose of having three people.

19    Q.    Each panel member --

20    A.    Each panel member would individually rank

21 the members and then they would discuss -- I

1 expected them to discuss and if they came to

2 agreement on the rank order of the five or eight

3 candidates, how ever many there were, they should

4 present it that way.

5       If they didn't come to consensus which I

6 didn't contemplate in any written document, but if

7 they didn't, my expectation would be that they

8 would present that to me, panel member so and so

9 had these people ranked.  Panel member so and so

10 had these people ranked.

11      I would have expected to see that and in

12 some instances I did receive memorandums that

13 contained that kind of information and in this

14 instance we know that the memorandum contains that

15 information that there was not total consensus on

16 all eight position in rank order.

17  Q.   Did you have any preset criteria for

18 determining how the panel members should rank

19 candidates?

20  A.   They should -- did I have a preset criteria?

21 They were to rank the candidates based on the job

1 announcement, based on the criteria that we had

2 established in the questions and that the questions

3 were divided up into areas of importance,

4 investigative ability, leadership ability,

5 communication skill, writing ability, timeliness,

6 et cetera.  I expected them to rate them based

7 on -- each candidate based on those skill sets.

8  Q.   But nothing that said to them this is how to

9 rate these answers or criteria?

10  A.   No.

11  Q.   Let's just stick with this second bullet.

12 At the end of the process the special agent in

13 charge forwarded the notes to headquarters for

14 retention.  What's that all about?

15  A.   One of the -- where is that?

16  Q.   The very last sentence on the first page.

17  A.   Right.  One of the requirements that I

18 included in the process was that each panel member

19 will take notes separate and distinct.

20  Q.   Each panel member?

21  A.   Each panel member and then at the end of the

1 interview process, they would provide those notes

2 to headquarters so that we would have a record for

3 the future as to exactly what the nature of the

4 interview was and what the individual panel members

5 comments were regarding each candidate.

6    Q.    Were each of the panels -- and I have a list

7 in here of the -- to your recollection did each of

8 the panels or each of the special agents in charge

9 sitting on each of the panels forward the notes of

10 the panel members to headquarters?

11   A.    Yes.   That is my recollection that everyone

12 did.

13   Q.    Including Mr. Huggins in the Washington

14 Field Office?

15   A.    Correct.

16   Q.    Do you know where those notes are today?

17   A.    They should be in headquarters.

18   Q.    And leaving out where they should be, do you

19 actually know where they are?

20   A.    I did not look for them, no.

21   Q.    Was it once that was done that the panels

1 involvement and by that I include the special agent

2 in charge's involvement in the selection process

3 was then expected to come to an end?

4    A.    Correct.

5    Q.    With the submission of a memorandum?

6    A.    Exactly.

7    Q.    As I see the process here, the panel gets

8 all of the applications and conducts whatever

9 deliberations it wants to either individually or as

10 a group and then interviews candidates, gives them

11 certain questions, and then -- and takes notes at

12 the time and then at that point the notes are

13 forwarded to headquarters as well as the panel's

14 recommendations and/or ranking of candidates?

15    A.    Correct, they did.

16    Q.    Did you contemplate that in that process

17 there would be any other measures that would be

18 taken or steps to evaluate candidates?

19    A.    No, I think that was the entire sum and

20 substance of the memorandum.

21    Q.    Was there any expectation on your part that

Page 27

1 other people would be consulted during the

2 selection process?

3    A.    Yes, there was the -- my intention in

4 announcing and we announced, I think, ten vacancies

5 around the country was that we would receive

6 applicants from various offices for these positions

7 so they weren't restricted by office; in other

8 words a candidate in the Washington Field Office

9 could have applied for the senior special agent

10 position in Los Angeles.

11        It's very possible that the panel that had

12 been developed for that Los Angeles position would

13 have no knowledge whatsoever of that particular

14 applicant so what my intent was was in those

15 instances and I can't tell you for sure whether it

16 happened that the panel members should certainly

17 avail themselves of the opportunity to talk to the

18 applicant's first-line supervisor at least.  That

19 would be the ASAC or the SAC of the field office

20 where the applicant was working.

21    Q.    And that would be in those instances where

1 an applicant applied for a position that was not

2 within his or her region, I take it?

3    A.    Exactly.

4    Q.    Other than that, was there any reason to do

5 that in your expectation?

6    A.    No.

7    Q.    Now, let's take the process forward.  Let's

8 go to page 2, the third bulleted paragraph.  I

9 think we have covered the first sentence, which

10 just for the record talks about the memorandum to

11 the assistant inspector general which was you at

12 the time, I take it?

13   A.    Correct.

14   Q.    And then it says what the memorandum should

15 include?

16   A.    Correct.

17   Q.    And it again continues with an explanation

18 of what the memorandum should include?

19   A.    Yes.

20   Q.    At this point having set these procedures

21 out, which are before your level, I take it that

1 concludes what's in this memorandum?

2   A.    Say that again.  I'm sorry.

3   Q.    That concludes what's in this memorandum up

4 to and immediately before this evaluation, if any,

5 undertaken at headquarters of candidates?

6   A.    Correct.

7   Q.    So in your expectation of the process what

8 was to happen next?

9   A.    What was to happen after --

10  Q.    Yes.

11  A.    -- the conclusion of what occurred in this

12 memorandum?

13  Q.    Correct.

14  A.    That I would receive the completed panel

15 results which would be in the form of a memorandum

16 to me from the special agent in charge of the

17 office that had the vacancy.  I would receive the

18 notes of the panel members.

19      I would receive all the applications and I

20 received these packages from all over the country.

21 There were as I said ten positions announced, I

1 think, in -- I think there were seven -- six or

2 seven different panels going on at the same time.

3   Q.   And we won't hold you to that.

4   A.   I would receive the -- I received this

5 package from each panel.  I reviewed it principally

6 looking at the memorandum and then I made a

7 selection -- selections based on that.

8   Q.   Did Mr. Fine or anyone above you in the

9 hierarchy have to sign off on those selections you

10 were making?

11   A.   Prior to a final selection, although I am

12 the selecting official, Mr. Fine asks that people

13 in my position advise him of what our selection is

14 and so I would have done that as a matter of

15 course.

16   Q.   Did you prepare any written documents of any

17 sort whether they are rankings, evaluations, notes

18 or anything concerning the potential selectees for

19 these positions?

20   A.   No, I didn't except for the announcement

21 document that told the offices who was selected.

December 17, 2004

MEMORANDUM FOR ALL SPECIAL AGENTS IN CHARGE

FROM:                    THOMAS F. MCLAUGHLIN
                         ASSISTANT INSPECTOR GENERAL
                         FOR INVESTIGATIONS

SUBJECT:                 Senior Special Agent Program

        Recently, Inspector General Glenn A. Fine approved additional Senior Special Agent (SSA) positions for the Investigations Division.  The increase in positions will enable the Division to build on the existing program and employ the team approach in priority investigations and other key initiatives.  At the same time, the Division will be better positioned to rely on a highly motivated staff of senior, non-supervisory agents to regularly handle the most difficult assignments and to assist in the overall management of the Division.

        Vacancy announcements for the new SSA positions will be published shortly.  All interested special agents are encouraged to apply for positions in their own office as well as in offices around the country.

        As set forth below, new interview procedures are being instituted to help ensure the selection of the best-qualified candidates to fill SSA vacancies.  They are as follows:

  •  A three-member panel will be selected to interview all candidates for the position of SSA.  While the individual members may vary, the panel's core composition will remain the same.  In most instances, the panel will consist of the Special Agent in Charge (SAC) from the office where a vacancy exits, a manager from another OIG field office, and a manager from Headquarters.

  •  The three-member panel will interview each candidate, using a set of 25 pre-determined questions (attached).  Candidates will be asked to respond to questions intended to help evaluate a person's investigative skills and leadership traits.  During the interview, each panel member will be required to take notes.  At the end of the process, the SAC should forward the notes to Headquarters for retention.



5

- On completing the interviews, the SAC will submit a memorandum to the Assistant Inspector General, Investigations Division, with the panel's recommendation of the best-qualified candidate for the SSA position. In the memorandum, the SAC should identify the date and place of the interviews, the names of the panel members, the names of the candidates who were interviewed and their rank order, and the name of the individual who is being recommended for promotion to the SSA position. Additionally, the SAC should briefly explain the basis for recommending the candidate, to include a discussion of the investigative skills and leadership traits that set the candidate apart from other applicants.

In closing, I ask for your full cooperation in this important process so that we – the Investigations Division – are able to select the best-qualified, ideally suited, and highly motivated candidates for the position of Senior Special Agent.

Please share this memorandum with your employees. The attached set of questions should not be shared except with your management team.

Attachment

ᑲ



*Fig Jul 2/4/05*

**USAJOBS** USAJOBS is the official job site of the United States Federal Government.
"WORKING FOR AMERICA" It's your one-stop source for Federal jobs and employment information.

HOME | SEARCH JOBS | MY USAJOBS | FORMS ...

## Office Of The Inspector General

**Department: Department Of Justice**
**Agency: Justice, Office of the Inspector General**
Job Announcement Number: OIG-2005-05

| Overview | Duties | Qualifications and Evaluation | How to Apply | Benefits and Other Information |

→ Back to Search Results

### SENIOR CRIMINAL INVESTIGATOR

**SALARY RANGE:** 88,369.00 - 114,882.00 USD per year
This position includes 25% Law Enforcement Availability Pay.

**OPEN PERIOD:** Monday, January 17, 2005 to Friday, February 04, 2005

**SERIES & GRADE:** GS-1811-14/14

**POSITION INFORMATION:** Full-Time Permanent

**DUTY LOCATIONS:** 1 vacancy - Alexandria, Arlington & Falls Church, VA

**WHO MAY BE CONSIDERED:**
Applications will be accepted from current agency employees only.

**JOB SUMMARY:**

**THIS POSITION IS OPENED TO OIG STATUS EMPLOYEES ONLY.**

**THIS POSITION IS LOCATED IN THE INVESTIGATIONS DIVISION, WASHINGTON FIELD OFFICE.**

The Office of the Inspector General, U.S. Department of Justice (DOJ), promotes economy, efficiency and effectiveness within DOJ. The Office of the Inspector General also enforces criminal and civil laws, regulations, and ethical standards within DOJ by investigating individuals and organizations who allegedly are involved in financial, contractual, or criminal misconduct in DOJ programs and operations.

The Investigations Division investigates alleged violations of fraud, abuse, and integrity laws that govern DOJ employees, operations, grantees, and contractors. The Investigations Division Special Agents develop cases for criminal prosecution and civil or administrative action.

**A RELOCATION BONUS OF UP TO $10,000 MAY BE PAID.**

**KEY REQUIREMENTS:**

* Time in Grade

DEPOSITION
EXHIBIT
#2
12-13-06
OLESKOWICZ

→ Back to Search Results

✉ PRINT

✉ EMAIL A FRIEND

*1*



**USAJOBS** is the official job site of the United States Federal Government.
"WORKING FOR AMERICA" It's your one-stop source for Federal jobs and employment information.

FAQ | PRIVACY POLICY | HELP | SITE MAP

HOME | SEARCH JOBS | MY USAJOBS | FORMS | EMPLOYER SERVICES

## Office Of The Inspector General

Department: Department Of Justice
Agency: Justice, Office of the Inspector General
Job Announcement Number: OIG-2005-05

Overview | Duties | Qualifications and Evaluation | How to Apply | Benefits and Other Information

➔ Back to Search Results

### SENIOR CRIMINAL INVESTIGATOR

**Additional Duty Location Info:**
1 vacancy - Alexandria, Arlington & Falls Church, VA

**MAJOR DUTIES:**

**The incumbent in this position serves as a senior criminal investigator responsible for Quality Assurance of investigations and report drafting within a field office as part of a National Quality Assurance strategy. The incumbent is responsible for the field office efforts in implementing effective quality control procedures; reviewing the investigative work products in draft and/or final form, identifying problem areas and recommending supplemental activities or corrections; performing analyses and conducting investigations with regard to a wide variety of allegations received by the Office of the Inspector General; drafting and preparing concise, logical briefings and reports of investigation and summaries, including recommendations for prosecute and/or administrative action; participating as a management official in developing field office policy and in implementing division-wide policy relative to quality, investigative techniques and procedures; assisting the Special Agent in Charge and Assistant Special Agent in Charge in coordinating and referring completed investigative matters to the DOJ for evaluation and action as appropriate. Performs special assignments where investigative matters cover a wide range of U.S. Codes and administrative laws; and performs other duties as assigned.**

➔ Back to Search Results

 **PRINT**      **EMAIL A FRIEND**

 **Send Mail**

**Send Mail to:**
Department Of Justice
DOJ/OIG/OFFICE OF HUMAN RESOURCES
1425 NEW YORK AVENUE, N.W., ste 7018
WASHINGTON, DC 20530
US
Fax: 202-305-9755

**Questions?**

**For questions about this job:**
DOJ/OIG OFFICE OF HUMAN RESOURCES
Phone: 202-616-4501
Fax: 202-305-9755
Internet: oig.personnel@usdoj.gov

**USAJOBS Control Number:** 362093

EEO Policy Statement | Reasonable Accommodation Policy Statement | Veterans Information
Legal and Regulatory Guidance

2



**USAJOBS** "WORKING FOR AMERICA"

USAJOBS is the official job site of the United States Federal Government. It's your one-stop source for Federal jobs and employment information.

FAQS | PRIVACY POLICY | HELP | SITE MAP

HOME | SEARCH JOBS | MY USAJOBS | FORMS | EMPLOYER SERVICES

## Office Of The Inspector General

Department: Department Of Justice
Agency: Justice, Office of the Inspector General
Job Announcement Number: OIG-2005-05

Overview | Duties | Qualifications and Evaluation | How to Apply | Benefits and Other Information

→ Back to Search Results

## SENIOR CRIMINAL INVESTIGATOR

### QUALIFICATIONS REQUIRED:

You must have one year of specialized experience at a level close to the work of this job that has given you the particular knowledge, skills, and abilities required to successfully perform. Typically we would find this experience in work within this field or a field that is closely related.

After appointment, you will be subject to random testing for illegal drug use.

Time in grade restrictions must be met by the closing date of the announcement.

You will be required to do some travel.

### HOW YOU WILL BE EVALUATED:

You will be evaluated to determine if you meet the minimum qualifications required; and on the extent to which your application shows that you possess the knowledges, skills, and abilities associated with this position as defined below. When describing your knowledges, skills, and abilities, please be sure to give examples and explain how often you used these skills, the complexity of the knowledge you possessed, the level of the people you interacted with, the sensitivity of the issues you handled, etc.

(1) Comprehensive and extensive knowledge of investigative principles, techniques, methods and procedures in order to oversee, coordinate and conduct the full range of investigative activities; (2) Ability to effectively present information both orally and in writing to convey ideas and concepts, defend rationale and gain support for a position or proposed activity; (3) Expert knowledge of the OIG, its operations pertinent laws, policies, and regulations in order to plan, conduct and coordinate investigations related to fraud, waste, abuse and other mismanagement; (4) Skill in recognizing, developing and presenting evidence that reconstructs events, sequences and time elements; and establishes relationships, responsibilities, legal liabilities and conflicts of interest in a manner that meet requirements for presentation in various legal hearings and court proceedings.

→ Back to Search Results

PRINT     ✉ EMAIL A FRIEND

✉ Send Mail     ? Questions?

3



# Office Of The Inspector General

**Department: Department Of Justice**
**Agency: Justice, Office of the Inspector General**
Job Announcement Number: OIG-2005-05

| Overview | Duties | Qualifications and Evaluation | How to Apply | Benefits and Other Information |

← Back to Search Results

**SENIOR CRIMINAL INVESTIGATOR**

**HOW TO APPLY:**
You must submit your application so that it will be received by the closing date of the announcement.

Please submit the following:  (1) A written application for employment.  You may use an OF-612, Optional Application for Federal Employment, a resume  or any other written format. Although we do not require a specific format, certain information is required to determine if you are qualified. You must include all of the information specified in this vacancy announcement.  A Narrative Assessment of your qualifications in terms of the Knowledge, Skills and Abilities identified within this announcement.  Describe experience (paid or unpaid), education, training and self-development as related to the KSAs.

You must submit a copy of your last Notification of Personnel Action (SF50) and a copy of your most recent Performance Appraisal.

**AGENCY CONTACT INFO:**

DOJ/OIG OFFICE OF HUMAN RESOURCES
Phone: 202-616-4501
Fax: 202-305-9755
Internet: oig.personnel@usdoj.gov

Or write:
Department Of Justice
DOJ/OIG/OFFICE OF HUMAN RESOURCES
1425 NEW YORK AVENUE, N.W., ste 7018
WASHINGTON, DC 20530
US
Fax: 202-305-9755

**WHAT TO EXPECT NEXT:**
Once your complete application is received we will conduct an evaluation of your qualifications and determine your ranking. The most highly qualified candidates will be referred to the hiring manager for further consideration and possible interview. We expect to make a selection within 45 days of the closing date of this announcement. You will be notified of the outcome.

← Back to Search Results

PRINT      EMAIL A FRIEND

Send Mail      Questions?



**USAJOBS** is the official job site of the United States Federal Government.
"WORKING FOR AMERICA"    It's your one-stop source for Federal jobs and employment information.

FAQS | PRIVACY POLICY | HELP | SITE MAP

HOME | SEARCH JOBS | MY USAJOBS | FORMS | EMPLOYER SERVICES

## Office Of The Inspector General

**Department: Department Of Justice**
**Agency: Justice, Office of the Inspector General**
Job Announcement Number: OIG-2005-05

| Overview | Duties | Qualifications and Evaluation | How to Apply | Benefits and Other Information |

← Back to Search Results

### SENIOR CRIMINAL INVESTIGATOR

**BENEFITS:**

You may participate in the Federal Employees Health Benefits program, with costs shared with your employer. More info: http://www.usajobs.opm.gov/jobextrainfo.asp#FEHB.

Life insurance coverage is provided. More info: http://www.usajobs.opm.gov/jobextrainfo.asp#life

Long-Term Care Insurance is offered and carries into your retirement. More info: http://www.usajobs.opm.gov/jobextrainfo.asp#ltci

### OTHER INFORMATION:

You must submit all required information by the closing date. If materials are not received, your application will be evaluated solely on the information available and you may not receive full consideration or may not be considered eligible.

The materials you send with your application will not be returned.

← Back to Search Results

 PRINT

 EMAIL A FRIEND

 Send Mail

? Questions?

**Send Mail to:**
Department Of Justice
DOJ/OIG/OFFICE OF HUMAN
RESOURCES
1425 NEW YORK AVENUE, N.W., ste
7018
WASHINGTON, DC 20530
US
Fax: 202-305-9755

**For questions about this job:**
DOJ/OIG OFFICE OF HUMAN
RESOURCES
Phone: 202-616-4501
Fax: 202-305-9755
Internet: oig.personnel@usdoj.gov

**USAJOBS Control Number:** 362093

EEO Policy Statement | Reasonable Accommodation Policy Statement | Veterans Information
Legal and Regulatory Guidance







**Pendleton, Mark A. (OIG)**

| | |
|---|---|
| **From:** | McLaughlin, Thomas F. (OIG) |
| **Sent:** | Wednesday, May 25, 2005 3:22 PM |
| **To:** | IGNITE (INV) |
| **Cc:** | Fine, Glenn A. (OIG); Martin, Paul K. (OIG); Peters, Gregory T. (OIG) |
| **Subject:** | Promotions/Selections |

I am pleased to announce the following promotions within the Investigations Division and the selections for the Leadership Development Program. Please join me in congratulating these fine employees and wishing them well as they assume their new responsibilities.

## Headquarters Positions – Grade 14

Senior Investigative Specialist – Operations Branch       Sharon Phelps
ASAC - Investigative Support Branch                        James Warren
ASAC - Operations Branch                                   Michael Tompkins

## Field Office Senior Special Agent Positions – Grade 14

Washington Field Office          Scott Myers
                                 Michael Fletcher

Dallas Field Office              James Mahon
Houston Area Office              Rose Atilano
El Paso Area Office              Eric Benn

Fraud Detection Office           Ken Dieffenbach

Los Angeles Field Office         Kalvin Cressel
San Francisco Area Office        Angel Gordon

Chicago Field Office             Victor Gryniewicz

Miami Field Office               Frank Haney

Denver Field Office              Craig Trautner

(There is no selection made for the Atlanta Area Office at this time.)

## Leadership Development Program

Jill Semmerling - Chicago
Eric Blachman – New York
Nick Candela - Detroit
Ray Hurst - Dallas
John Schwartz - Houston



EXHIBIT

Exhibit No. 6
dmc 12/14/06

Promotions will be effective June 12, 2005.

Thank you..........tfm



**U. S. Department of Justice**

**Office of the Inspector General**

Washington Field Office        202-616-4766 (PHONE)
1300 North 17ᵗʰ Street Suite 3200   202-616-9884 (FAX)
Arlington, VA  22209

March 16, 2005

MEMORANDUM

TO:                    Thomas F. McLaughlin
                       Assistant Inspector General
                       For Investigations


FROM:                  Charles T. Huggins
                       Special Agent in Charge
                       Washington Field Office

SUBJECT:               WFO Senior Special Agent Interviews

      Reference is made to your memorandum dated December 23, 2004 regarding additional Senior Special Agent (SSA) positions for the Investigations Division.

      Vacancy announcement number OIG-2005-05 opened on January 17, 2005 and closed on February 4, 2005.  Eight special agents applied for the WFO vacancy and were referred to WFO to be interviewed.  ASAC William F. Johnson, Headquarters, ASAC John F. Oleskowicz, CFO, and I were selected to conduct the panel interviews.  The interviews were conducted at WFO on February 28, 2005, March 2, 2005 and March 7, 2005 in person and via teleconferencing and telephone.

      Prior to the interviews each panel member reviewed the candidate's applicant packet and discussed their strengths and weaknesses with their individual supervisor(s).  While the panel wanted to give veteran OIG agents appropriate credit for their dedication and their accomplishments at the OIG, we did not want to shortchange those candidates who had strong law enforcement experience and qualifications, but less OIG experience.  Accordingly, we have based our rankings of the below listed candidates on the totality of their law enforcement work history, their life experiences, knowledge of their performance at the OIG, and their responses to the standard set of questions, including their logic and persuasiveness in presenting their answers.

      At the onset of each interview I explained to each candidate that the SSA position was created to identify highly motivated and qualified personnel to assist management functions of the Investigations Division.  Further that SSAs are expected to personally conduct, coordinate and/or lead difficult and sensitive investigations, assist with work quality reviews (which may provide support for official performance evaluations), and to help formulate and implement policy.  I told each of them that it is particularly important

PENGAD 800-631-6989

EXHIBIT

Exhibit No. 7
dmc 12/14/06

Thomas F. McLaughlin
Page 2

that the person selected possess outstanding investigative skills, as well as leadership traits. Lastly, I told them that the purpose and focus of their interview was to elicit information that would provide insights in determining whether they possessed the necessary skills and leadership traits required of an SSA.

During their interviews, each of the eight candidates were asked the exact same thirteen questions – which none of them had seen before – and which were relevant to the leadership traits required of an SSA. These questions also assessed the candidates' poise and ability to give coherent presentations in a high-pressure situation, which was indicative of their potential performance in high-level briefings before the Inspector General and other high-level Department officials. Finally, the interview provided insight into the candidates' leadership qualities – i.e., their ability to express themselves forcefully in a high-pressure situation.

Following the interviews, the panel members separately and independently summarized our impressions of each candidate, and ranked the candidates in order, based on their interview responses, as well as the aforementioned factors. ASACs Johnson, Oleskowicz and I independently ranked the first five candidates in the same order and the last three candidates in slightly different order. Our panel ranked the candidates in the following order: **Michael P. Tompkins, Scott A. Myers, Michael W. Fletcher, Mark A. Pendleton, Steven A. Carrera, Dorothy M. Wortham, David E. Trosch and Thomas A. Gibson.**

First choice, **Michael P. Tompkins**, is considered an outstanding candidate. Mr. Tompkins has over 20 years of law enforcement experience with the DOJ/OIG and Naval Criminal Investigative Service (NCIS). Mr. Tompkins served in a wide range of assignments with NCIS to include Acting Resident Agent in Charge of the Camp Pendleton, CA Resident Agency. This office is the largest NCIS office in the Western U.S. He supervised three subordinate offices in Southern California and Western Arizona with twenty seven field agents and six support personnel. In his last assignment with NCIS, Mr. Tompkins was temporarily promoted to ASAC (GS-14), San Diego Field Office (SDFO) responsible for the Initiative/Special Operations Squad supervising forty three Special Agents, two subordinate supervisors, two computer specialists and one administrative support employee. Since joining the OIG Mr. Tompkins served in the SDFO before transferring to WFO in July 2003. Since arriving at WFO he has completed seven complex priority investigations and several other cases. He has been assigned as the Acting ASAC providing operational guidance to the agents and conducting case reviews. In his most recent yearly evaluation his ASAC identified him as a top-performer in the office and someone who could be tasked with the most difficult and challenging investigative assignments. During his interview for the SSA position, Mr. Tompkins projected a command presence while providing answers that were both

2

Thomas F. McLaughlin
Page 3

thoughtful and well reasoned. He has a depth of experience, interpersonal skills, and organizational abilities that suggest he will be able to assume the responsibilities of the SSA in an outstanding manner.

Second choice, **Scott A. Myers,** is considered an outstanding candidate. Mr. Myers has over 26 years of law enforcement experience including one year with the OIG, 20 years with the U.S. Secret Service and five years with the Atlanta City Police Department. Mr. Myers has extensive experience in criminal investigations in large and small offices. He served as the Resident Agent in charge of the Tulsa, OK Resident Agency where he was responsible for supervising a three agent office with two clerical staff. He coordinated, assigned, or conducted criminal investigations in addition to being responsible for domestic terrorism issues in the wake of the OK City bombing. In his last assignment with the Secret Service he served as an ASAC (GS-14) in the Forensic Services Division for four years. He was responsible for the day to day management of the 35 member polygraph program. Mr. Myers is currently conducting a complex FBI whistleblower investigation based on allegations of retaliation and nonfeasance of duty against several high-level FBI officials. Mr. Myers has conducted numerous interviews of high ranking FBI officials nationwide and conducted extensive document review and analysis. During his interview for the SSA position, Mr. Myers projected a command presence and was exceptionally articulate. He displayed both the understanding and the application of all of the requisite SSA traits, with particular strength in the areas of leadership, interpersonal skills and organization.

Third choice, **Michael W. Fletcher,** is considered an outstanding candidate. Mr. Fletcher has over 22 years of law enforcement experience including one year with the OIG and 21 years with the U.S. Secret Service. Mr. Fletcher has a strong criminal investigative background having served in Secret Service offices in Washington, DC, Miami, FL, New York City, NY and Paris, France. While assigned to the American Embassy in Paris, France, from 1998-2002, he was responsible for investigations (especially in the area of financial crimes) and issues of Secret Service interest in a number of countries to include the former Soviet countries of Moldova, Belarus, and Latvia. Upon his return to the United States he was promoted to Assistant to the Special Agent in Charge (GS-14) of the Washington Field Office where he supervised 20 special agents. Since arriving at WFO Mr. Fletcher has handled a number of FBI, DEA and U.S. Marshals Service priority investigations. During his interview for the SSA position, Mr. Fletcher projected a mature and professional image. He displayed a sense of self confidence while fielding a wide range of difficult questions. He possesses the leadership traits required of an SSA.

3

Thomas F. McLaughlin
Page 4

     Fourth choice, **Mark A. Pendleton,** is considered an above average candidate. Mr. Pendleton has over 25 years of law enforcement experience with the DOJ/OIG, GPO/OIG, AG/OIG and the Federal Protective Service. Mr. Pendleton possesses a great amount of institutional knowledge about the DOJ/OIG but lacks any substantive supervisory experience. Although he has willingly worked a wide range of investigations while assigned to the OIG he continues to require further enhancement in his writing and organizational skills. During his interview for the SSA position, Mr. Pendleton projected a professional image but failed to fully answer several questions, and at times, appeared to ramble.

     Fifth choice, **Steven M. Carrera,** is considered an above average candidate. Mr. Carrera has over 14 years of law enforcement experience with the DOJ/OIG and the Department of State OIG. Mr. Carrera has worked a wide range of investigations while assigned to the OIG to include the last year and a half on the Smith-Leung FBI espionage review. Mr. Carrera lacks any substantive supervisory experience and needs to improve in the area of attention to detail. During his interview for the SSA position, Mr. Carrera projected a professional image; however, his oral presentation skills were lacking.

     Sixth choice, **Dorothy M. Wortham,** is considered an average candidate. Ms. Wortham has over 13 years of law enforcement experience with the DOJ/OIG and AG/OIG. She is approaching 2 years in grade at the GS-13 level. She has worked a wide range of investigations since being assigned to the OIG; however, she does not work well on her own. During her interview for the SSA position, Ms. Wortham projected a professional image but appeared nervous and struggled in her oral responses to the panel's question. Ms. Wortham would be an ideal candidate for the Leadership Development Program.

     Seventh choice, **David E. Trosch,** is considered an average candidate. Mr. Trosch has 11 years of law enforcement experience with the DOJ/OIG and DCIS. He is presently assigned to the Fraud Detection Office (FDO) and has not been assigned to work a priority investigation. In his last assignment with DCIS he served in the Computer Evidence Recovery Program as a Program Manager (GS-14). Prior to his assignment to the FDO, in April of 2004, Mr. Trosch had not worked an investigation as the lead case agent since July 1998. During his interview for the SSA position, Mr. Trosch projected a professional image and while his answers were thoughtful and articulate they lacked substance.

     Eighth choice, **Thomas A. Gibson,** is considered an average candidate. Mr. Gibson has more than 20 years of experience as a criminal investigator and 7 years as a uniformed U.S. Secret Service police officer. Mr. Gibson has served as an agent with the IRS, DCIS, Postal Service Inspector General and the DOJ/OIG. He is presently assigned to the FDO and has not been assigned to work a priority investigation. During his interview for the SSA position, Mr. Gibson projected a professional image; however, the panel felt that his answers to the standard set of questions lacked substance.

4

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF INSPECTOR GENERAL
REPORT OF INVESTIGATION

| | | |
|---|---|---|
| Mark Alton Pendleton | * | |
| | * | |
| Complainant, | * | |
| | * | |
| | * | Docket Number B-05-2536 |
| Office of Inspector General | * | |
| U.S. Department of Justice | * | |
| Washington, D.C. | * | |
| | * | |
| Agency. | * | |

_____

INTERROGATORY FOR Thomas F. McLaughlin

_____

For the record.  In a letter dated September 1, 2005, from Ted McBurrows,
Director, EEO Staff, Justice Management Division, DOJ, to Complainant's
representative, Mr. Robert Seldon, the following was accepted for investigation:

Complainant alleges that because of his race (Black), age (49) and reprisal,
he was not selected for one of two GS-14 Senior Criminal Investigator positions
(Vacancy number OIG-2005-05).


Q:  Please provide your full name for the record.
A: THOMAS FRANCIS MCLAUGHLIN


Q:  Do you have a representative?  If so, identify the representative to include
business address and phone number (if federal employee, position, series, and
grade).
A:  NO

EXHIBIT

Exhibit No. 8
dmc 12/14/06

PENGAD 800-631-6989

1

Initials

Q:  Please state the unit, branch, division and Agency in which you are currently employed.  If less than two years provide information regarding previous employment.
A:  DEPARTMENT OF JUSTICE, OFFICE OF THE INSPECTOR GENERAL, INVESTIGATIONS DIVISION.

Q:  What is your job title, grade and series?
A: ASSISTANT INSPECTOR GENERAL (AIG) – SES - 1811

Q:  How long have you been in that position?
A:  SINCE NOVEMBER 2004

Q:  How long had you worked at DOJ?
A:  SINCE JULY 1990

Q:  What is the name and title of your first line supervisor, and how long were you under their supervision?  If less than two years provide information regarding previous supervisor.
A:  CURRENT FIRST LINE SUPERVISOR IS DEPUTY INSPECTOR GENERAL (DIG) PAUL MARTIN – SINCE 11/04.  PRIOR FIRST LINE SUPERVISOR WAS AIG T.J. BONDURANT.

Q:  What is the name and title of your second line supervisor, and how long were you under their supervision?  If less than two years provide information regarding previous supervisor.
A:  CURRENT SECOND LINE SUPERVISOR IS INSPECTOR GENERAL GLENN FINE – SINCE 11/04.  PRIOR SECOND LINE SUPERVISOR WAS DIG PAUL MARTIN.

Q:  State your Race.
A:  WHITE

Q:  State your DOB.
A:  12/31/1946

2

Initials

Q:  Do you know the Complainant, Mark Alton Pendleton?  If so, when did you become acquainted with him and in what capacity have you known him; i.e., co-worker, subordinate, and/or personal friend?
A:  YES.  SINCE 1990.  CO-WORKER.


Q:  In what capacity were you involved in the selection process for the GS-14 Senior Criminal Investigator positions advertised in Vacancy Announcement number OIG-2005-05?
A:  SELECTING OFFICIAL.


Q:  How many positions were filled from Vacancy Announcement number OIG-2005-05 and where were the positions located?
A:  TWO POSITIONS IN THE WASHINGTON FIELD OFFICE.


Q:  Who did you recommend or select for the position(s) and what were your reasons?
A:  I SELECTED MICHAEL FLETCHER AND SCOTT MYERS.


Q:  What is the Race of the selectee(s)?
A:  THEY BOTH APPEAR TO BE CAUCASIAN.


Q:  What is the age of the selectee(s)?
A:  I DO NOT KNOW.


Q:  Did the selectee(s) have any prior EEO activity?
A:  I DO NOT KNOW.


Q:  Was the complainant on the referral for this vacancy announcement?
A:  YES

3

Initials

Q:  Did you interview the complainant for this/these position(s)?  If not, why not?

A:  NO.  I DID NOT CONDUCT ANY INTERVIEWS MYSELF.  THE INTERVIEW PANEL INTERVIEWED MR. PENDLETON AND 7 OTHER CANDIDATES.  I REVIEWED THE RECOMMENDATIONS OF THE INTERVIEW PANEL CONTAINED IN A MEMORANDUM TO ME DATED MARCH 16, 2005 FROM SAC HUGGINS.  (SEE MARCH 16, 2005 MEMORANDUM FROM CHARLES HUGGINS TO THOMAS MCLAUGHLIN, ATTACHED).

THE INTERVIEW PANEL RANKED THE 8 APPLICANTS IN TERMS OF THEIR RECOMMENDED CHOICE(S).  THE HIGHEST RANKED CANDIDATE, MICHAEL P. TOMPKINS, HAD ALREADY BEEN SELECTED FOR PROMOTION TO ANOTHER POSITION IN HEADQUARTERS.  I SELECTED THE CANDIDATES WHICH THE PANEL RANKED SECOND (SCOTT A. MYERS) AND THIRD (MICHAEL W. FLETCHER).

Q: What were the selection criteria you used in making your decision to recommend or select for this/these position(s)?

A:  THE CRITERIA UPON WHICH THE SELECTIONS WERE MADE INCLUDED: INVESTIGATIVE ABILITIES, LEADERSHIP ABILITIES, INTERPERSONAL SKILLS, CHARACTER AND INTEGRITY, TIMELINESS, ORAL AND WRITTEN COMMUNICATION ABILITIES, AND PRIOR ACCOMPLISHMENTS.  (SEE DECEMBER 17, 2004 MEMORANDUM FROM THOMAS MCLAUGHLIN TO ALL SPECIAL AGENTS IN CHARGE RE: SENIOR SPECIAL AGENT PROGRAM).

Q: What was your reason for not recommending or not selecting the complainant?

A:  BOTH OF THE SELECTEES HAD EXTENSIVE LAW ENFORCEMENT EXPERIENCE AND SUPERIOR ABILITIES FOR THE SSA POSTIONS AT ISSUE.  MR. MEYERS HAD OVER 26 YEARS OF SUBSTANTIVE LAW ENFORCEMENT EXPERIENCE, WHILE MR. FLETCHER HAD 22 YEARS.  SIGNIFICANTLY, BOTH SELECTEES ALSO HAD SEVERAL YEARS OF SUBSTANTIVE LEADERSHIP EXPERIENCE AS GS-14 INVESTIGATIVE SUPERVISORS, WHICH MR. PENDLETON DID NOT.  FURTHER, I HAVE PERSONALLY OBSERVED BOTH OF THESE INDIVIDUALS' IMPRESSIVE INTERPERSONAL AND OGANIZATIONAL SKILLS DURING PRESENTATIONS WHICH THEY EACH PROVIDED TO THE INSPECTOR GENERAL.  HOWEVER, THE SINGLE PRESENTATION WHICH I SAW MR. PENDLETON GIVE (IN APPLYING FOR A LIAISON/INSTRUCTOR POSITION) WAS POORLY RECEIVED BY SEVERAL

4

Initials

OIG OFFICIALS. THIRD, MESSRS. MEYERS AND FLETCHERS' SUPERVISORS HAVE CONSISTENTLY RELATED THAT THEY ARE BOTH CONCISE AND EFFICIENT WRITERS, WHEREAS I HAVE BEEN INFORMED FOR MANY YEARS THAT MR. PENDLETON'S WRITING HAS REQUIRED SIGNIFICANT CORRECTION.

FINALLY, IN SELECTING FOR EACH OF THE ELEVEN SSA POSITIONS, I CERTAINLY RELIED ON THE RECOMMENDATIONS OF THE INTERVIEWING PANELS. THE OIG WENT TO GREAT CARE TO DEVELOP A FAIR AND OBJECTIVE PANEL SYSTEM INCLUDING AT LEAST TWO PANEL MEMBERS WHO DID NOT WORK DIRECTLY WITH THE CANDIDATE. THE PANEL FOR THE WASHINGTON FIELD OFFICE VACANCY RECOGNIZED MR. PENDLETON AS AN ABOVE AVERAGE CANDIDATE, WITH OVER 25 YEARS OF LAW ENFORCEMENT EXPERIENCE, AND CONSIDERABLE INSTITUTIONAL KNOWLEDGE ABOUT THE DOJ OIG. HOWEVER, THE PANEL CONFIRMED THAT MR. PENDLETON CONTINUED TO REQUIRE FURTHER ENHANCEMENT IN HIS WRITING AND ORGNIZATIONAL SKILLS. FURTHER, THE PANEL CLEARLY DID NOT CONSIDER MR. PENDLETON'S INTERVIEW RESPONSES TO BE AS CLEAR AND CONCISE AS THOSE OF THE SELECTEES. (SEE MARCH 16, 2006 MEMORANDUM, ATTACHED).

Q: Did you ever communicate to the complainant your reasons for not recommending or not selecting the complainant? If so, when, how and what did you tell him.
A: NO.

Q: What qualifications did the selectee(s) have that were better than the complainant's?
A: SEE ABOVE.

Q: Were race, age or prior EEO activity factors in consideration of who to recommend or select for this/these position(s)? If so, explain.
A: NO. I SELECTED THE CANDIDATES WITH THE MOST RELEVANT EXPERIENCE AND THE GREATEST ABILITY TO ASSIST MANAGEMENT IN THESE SENIOR SPECIAL AGENT POSITIONS WITHIN THE OIG WASHINGTON FIELD OFFICE.

5

Initials

Q: Do you have any documents you wish to provide? If so, please provide a list identifying the documents, number each page and affix your initials to the first page of each document.
A. SEE THE (TWO) DOCUMENTS REFERENCED ABOVE (ATTACHED).


Q: Is there anything you would like to add to your statement?
A: IT IS NOTEWORTHY THAT AT THE TIME THESE SELECTIONS WERE MADE, I SELECTED A TOTAL OF ELEVEN SENIOR SPECIAL AGENT POSITIONS AROUND THE COUNTRY. THREE OF THE ELEVEN WERE MINORITY CANDIDATES INCLUDING AN AFRICAN AMERICAN MALE, AN AFRICAN AMERICAN FEMALE AND A HISPANIC FEMALE.

Pursuant to Title 28 U.S.C. _ 1746, I declare, under penalty of perjury, that the foregoing statement is true and correct to the best of my recollection. I understand the information I have given is not to be considered confidential and that it may be disclosed to authorized parties.

Affiant's signature

2 | 17 | 06
Date

6                                                                         Initials

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

MARK A. PENDLETON,                 :

    Plaintiff        :

   v.                      : No. 04-1838(RJL)

          :

JOHN ASHCROFT,                     :

    Defendant        :

- - - - - - - - - - - - - - -X

    DEPOSITION OF THOMAS J. BONDURANT

       Washington, D.C.

      Tuesday, August 15 2006


   Deposition of T. J.BONDURANT, called for

examination at 10:30 a.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

Page 2

1    APPEARANCES:

2        On behalf of the Plaintiff:

3            ROBERT C. SELDON, Esq.

4            Law Offices of Robert C. Seldon, P.C.

5            1319 F Street, N.W.,

6            Suite 305

7            Washington, D.C.  20004

8

9        On behalf of the Defendant:

10           JOHN F. HENAULT, Jr., Esq.

11           United States Department of Justice

12           United States Attorney's Office

13           555 4th Street, N.W.,

14           Washington, D.C.  20530

15           (202-307-1249)

16           GAIL ROBINSON, Esq.

17           General Counsel

18           Office of Inspector General, DOJ

19

20   Also present:

21           MARK PENDLETON

22

Page 3

```
 1                        C-O-N-T-E-N-T-S

 2 WITNESS                      DIRECT  CROSS REDIRECT

 3 Thomas J. Bondurant            4      118    121

 4                        E-X-H-I-B-I-T-S

 5 NUMBER                             IDENTIFICATION

 6 Deposition Exhibit No. 1               22

 7 Deposition Exhibit No. 2               35

 8 Deposition Exhibit No. 3               40

 9 Deposition Exhibit No. 4               92

10 Deposition Exhibit No. 5              101

11 Deposition Exhibit No. 6              107

12 Deposition Exhibit No. 7              109

13 Deposition Exhibit No. 8              111

14 Deposition Exhibit No. 9              114

15 Deposition Exhibit No. 10             116

16 Deposition Exhibit No. 11             117

17

18     (Exhibits furnished by Mr. Seldon.)

19

20

21

22
```

Page 4

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2 Whereupon,

 3              THOMAS J. BONDURANT

 4 was called as a witness and, having been first duly

 5 sworn, was examined and testified as follows:

 6              DIRECT EXAMINATION

 7         BY MR. SELDON:

 8    Q    Mr. Bondurant, good morning.

 9    A    Good morning.

10    Q    For the record, would you please give us

11 your full name?

12    A    Thomas James Bondurant.

13    Q    Mr. Bondurant, I take it that you were

14 previously employed by the Federal Government.

15    A    That's correct.

16    Q    What was your last position, sir?

17    A    Assistant inspector general for

18 investigations with the Department of Justice,

19 office of the inspector general.

20    Q    Mr. Bondurant, thanks for coming. Let me

21 explain what we're doing here, and then I'll ask

22 you a question.
```

Page 30

1 other cases -- I'm sorry.

2          I take it priority cases had a certain

3 amount of importance in your office.

4    A    Yes.

5    Q    Okay. Were there any other classes of

6 cases that were equally important?

7    A    Well, all of the investigations were

8 important.

9    Q    Correct.

10   A    But that's all I can think of at the

11 moment.

12   Q    The only class that was designated were

13 priority cases.

14   A    (Nods in the affirmative.)

15   Q    You need to say yes or no for the

16 Reporter.

17   A    Yes.

18   Q    Because we're not videotaping today.

19   A    Right.

20   Q    So let's then continue with this. It's

21 especially important that priority cases be worked

22 promptly.

Office of the Inspector General                                    Performance Award Recommendation and Approval Fo

## EMPLOYEE INFORMATION

| Employee: | Grade: |
|---|---|
| Mark A. Pendleton | GS/GM  13  Step  08  Job Series 1811 |
| Social Security No. | Position Title: |
| 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 | Special Agent |
| Division/Office/Location: | Award:  ☑ Sustained Superior Performance for the period 4/1/01 to 3/31/02 |
| Washington Field Office | ☐ Special Act/Achievement |

## JUSTIFICATION

(Rating Official must provide succinct justification for the value of Act/Performance/Achievement to the Division/Office or DOJ.)

During this rating period SA Pendleton has exceeded all performance requirements. Specifically, after the September 11th terrorist attack on the World Trade Center and the Pentagon, the FAA requested support from existing Special Agents from various law enforcement agencies to temporarily support their mission. SA Pendleton volunteered for the Federal Air Marshals (FAM) under the direction of the FAA. SA Pendleton served in this capacity from October 2001 to March 2002. This assignment required one week FAM training at Ft. Dix, New Jersey and being immediately deployed for assignments aboard domestic flights throughout the United States. While SA Pendleton's primary mission was the security and protections of aircraft's, airline personnel and passengers aboard all US carriers his duties included conducting a physical search of the aircraft, briefing the Captains/flight attendants, and coordinating with the Ground Security Officer for each airline and law enforcement agencies.

During this rating period he also successfully investigated a number of criminal matters. In August 2001, he arrested a former JMD employee for theft from a co-workers savings account at the Justice Federal Credit Union. The employee resigned her position with JMD during the course of the investigation and later was convicted and sentenced for the theft. In February 2002, SA Pendleton returned temporarily from the FAM program to prepare for a jury trial in Clarksburg, WVA. SA Pendleton conducted pretrial interviews of potential witnesses, testified and assisted the prosecutor during a criminal trial of a Correctional Officer who was charged with three counts of extortion. The Correctional Officer was found guilty and sentencing is pending. SA Pendleton's performed in an outstanding manner during this rating period.

☐ **Nomination for IG Honor Award** (Optional, by AIG/OD. Must provide concise citation of achievements below)

DEPOSITION
EXHIBIT
#7
PENGAD 800-631-6989
8-15-06

☐ **Nomination for IG Award of Merit** (Optional, by AIG/OD)

## APPROVALS

| Approval of Office Supervisor | Approval of Office Head: |
|---|---|
| | Amount of Award $ 2100 00 |
| Rating Official [signature] Date 5.7.02 | Signature: [signature] |
| Reviewing Official [signature] Date 5/7/02 | Title: A.I.... Date: 5/7/06 |

## To be Completed by M&P Division

| Personnel Review: | Funding Review and Authorization: |
|---|---|
| [signature] 5/31/02 | |
| Personnel Officer          Date | Financial Officer          Date |



**U. S. Department of Justice**

Office of the Inspector General

---

June 10, 2002

<u>MEMORANDUM</u>

TO:         Mark Pendleton
                Special Agent
                Washington Field Office

FROM:      Thomas J. Bondurant
                Assistant Inspector General
                Investigations Division .

SUBJECT:    <u>Performance Award</u>

     I am pleased to inform you that you have been awarded a bonus of $2,100 to recognize your superior performance and dedication to the goals of the Office of the Inspector General (OIG) during the most recent performance rating period.  This award will be electronically deposited to your account the week of June 24, 2002.

     You have distinguished yourself by the quality of your work during the past year and in doing so have brought distinction to your Office and the Investigations Division.  I am proud of the work that you and our Division have done and will continue to do to advance the mission of the OIG and the Department of Justice.  Please accept my sincere appreciation for your hard work and professionalism during this past year. Congratulations on this well-deserved award.

cc:  SAC Huggins



## EMPLOYEE INFORMATION

| | |
|---|---|
| **Employee:** <br> **Mark A. Pendleton** | **Grade:** <br> **GS/GM 13**  Step: **8** Job Series: **1811** |
| Social Security No.  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 | **Position Title:** Special Agent |
| **Division/Office/Location: OIG/WFO/INV** | **Award:** ☑  **Sustained Superior Performance for the period** <br> ☐  **Special Act/Achievement** |

## JUSTIFICATION

(Rating Official must provide succinct justification for the value of Act/Performance/Achievement to the Division/Office or DOJ.)

During this rating period SA Pendleton has performed all of his assigned duties in an excellent manner.  SA Pendleton has shown himself to be a valuable asset to the OIG by successfully undertaking a number of important cases and initiatives.  SA Pendleton provides the WFO a voice of experience and qualified frame of reference as a result of his tenure with the OIG.   Among the cases that SA Pendleton investigated, were ones involving allegations of a high-ranking DOJ official in a suspect relationship, an AUSA involved in a local criminal case, extortion, bribery, theft, misuse of position, and use of illicit substances.

In addition, SA Pendleton has provided very valuable assistance to other WFO agents in their investigations and initiatives.  SA Pendleton participated in the successful survey of a Federal Prison Camp, relative to the issue of sexual crimes investigations

SA Pendleton is a good report writer whose reporting routinely conforms to established OIG guidelines.  SA Pendleton readily accepts guidance and input on his written product on those instances when necessary.

SA Pendleton does a good job at case administration and his file maintenance is in conformity with all OIG regulations.  SA Pendleton has at all times exhibited proper evidence handling and documentation.

SA Pendleton has at all times presented and comported himself in a mature, polite, polished, and professional manner, that serves both to enhance the stature of the OIG and to provide a positive example to his fellow agents.  SA Pendleton has conducted himself very capably with both the public and with coworkers.

In addition to his other duties, SA Pendleton has also served as the property officer and has helped transition that function without error to a new officer.

☐  **Nomination for IG Honor Award** (*Optional, by AIG/OD.  Must provide concise citation of achievements below*)

☐  **Nomination for IG Award of Merit** (*Optional, by AIG/OD*)

DEPOSITION EXHIBIT #9  5-06  8-15-06  PENGAD 800-631-6989

## APPROVALS

| **Approval of Office Supervisor** | **Approval of Office Head:** |
|---|---|
| Rating Official   _Robert A. Bourbon_   Date _5/16/03_ | Amount of Award $ _2000.00_ <br> Signature _____ |
| Reviewing Official _G.J. Huggins_ Date _5.16.03_ | Title _AIG/INV_   Date: _5/15/03_ |

## To be Completed by M&P Division

| Personnel Review: | Funding Review and Authorization: |
|---|---|
| _Wanda Jo Haney_  _5/27/03_ <br> Personnel Officer    Date | _____ <br> Financial Officer    Date |



**U.S. Department of Justice**

Office of the Inspector General

*Washington, D.C. 20530*

June 5, 2003

MEMORANDUM FOR MARK PENDLETON
                  SPECIAL AGENT
                  WASHINGTON FIELD OFFICE

FROM:          T. J. BONDURANT
               ASSISTANT INSPECTOR GENERAL
               FOR INVESTIGATIONS

SUBJECT:      <u>Performance Award</u>

     I am pleased to inform you that you have been awarded a performance bonus of $2,000 to recognize your superior performance and dedication to the mission of the Office of the Inspector General (OIG) and the Investigations Division during the most recent performance rating period. This award will be deposited electronically to your account the week of June 23, 2003.

     You have distinguished yourself by the quality of your work during the past year and in doing so have brought distinction to the OIG. I am extremely proud of the work that you, our Division, and the OIG have done and will continue to do to advance the mission of the Department of Justice. Please accept my sincere appreciation for your hard work and professionalism during this past year of challenges and new demands. Congratulations on this award.



UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -X

MARK A. PENDLETON,                    :

   Plaintiff              :

   v.                     : No. 04-1838(RJL)

           :

JOHN ASHCROFT,                        :

   Defendant              :

- - - - - - - - - - - - - - -X

DEPOSITION OF WILLIE HAYNES

Washington, D.C.

Wednesday, March 29, 2006

Deposition of WILLIE HAYNES, called for

examination at 10:50 a.m., at the law offices of Robert

C. Seldon & Associates, P.C., 1319 F Street, N.W., Suite

305, Washington, D.C., before Gary S. Howard, a notary

public in and for the District of Columbia, when were

present on behalf of the respective parties:

Page 2

```
 1   APPEARANCES:
         On behalf of the Plaintiff:
 2         ROBERT C. SELDON, Esq.

 3         Law Offices of Robert C. Seldon, P.C.

 4         1319 F Street, N.W.,

 5         Suite 305

 6         Washington, D.C.

 7

 8      On behalf of the Defendant:

 9        JOHN F. HENAULT, Jr., Esq.

10         United States Department of Justice

11         United States Attorney's Office

12         555 4th Street, N.W.,

13         Washington, D.C.  20530

14         (202-307-1249)

15

16

17

18

19

20

21

22
```

```
 1                    C-O-N-T-E-N-T-S

 2 WITNESS              DIRECT    CROSS   REDIRECT

 3 Willie Haynes          4        86       95

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2 Whereupon,

 3                      WILLIE HAYNES

 4 was called as a witness and, having been first duly

 5 sworn, was examined and testified as follows:

 6                    DIRECT EXAMINATION

 7          BY MR. SELDON:

 8    Q     Mr. Haynes, good morning.

 9    A     Good morning.

10    Q     For the record, would you please give us

11 your full name and your present place of

12 employment?

13    A     Willie Haynes -- H-a-y-n-e-s -- U.S.

14 Department of Justice, office of the inspector

15 general, investigations division.

16    Q     What position do you hold there, Mr.

17 Haynes?

18    A     I'm what they call SAC -- special agent

19 in charge -- of the investigative support unit.

20    Q     What grade level are you?

21    A     Grade level 15.

22    Q     Okay. Mr. Haynes, let me start by saying
```

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARK A. PENDLETON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 07-1884 (JDB)** |
| | ) | |
| **MICHAEL B. MUKASEY,** | ) | |
| **Attorney General,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion to Dismiss or, in the Alternative, to Transfer;

Plaintiff's Opposition thereto; and the entire record in this matter;

It is hereby:

ORDERED that Defendant's Motion be, and the same hereby is, DENIED.

Dated this _____ day of ____, 2008.

_____
**UNITED STATES DISTRICT JUDGE**