UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK A. PENDLETON,

    Plaintiff,

    v.

ERIC HOLDER, Attorney General, United States Department of Justice

    Defendant.

Civil Action No. 07-1884 (JDB)

## MEMORANDUM OPINION

Mark Pendleton, a former Special Agent in the Department of Justice's Office of the Inspector General, was not promoted to Senior Special Agent in May 2005. He alleges that his non-promotion was the result of retaliation and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. Before the Court is Attorney General Eric Holder's motion for summary judgment. Upon careful consideration of the parties' memoranda, the applicable law, and the entire record herein, and for the reasons set forth below, the Court will grant the Attorney General's motion.

## BACKGROUND

Pendleton was an African-American Special Agent in the Washington Field Office of the Department of Justice's Office of the Inspector General ("OIG"). See Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") [Docket Entry 27], Decl. of Mark Pendleton ("Pendleton Decl."), ¶ 3. He served as a Special Agent at OIG from 1989 through 2008, see id., and during his tenure sought promotion to Senior Special Agent on several occasions, see Compl. ¶¶ 3-5. In 2003, after OIG did not select him for either of two Senior Special Agent openings, Pendleton filed an

Equal Employment Opportunity Commission ("EEOC") charge of discrimination, and a subsequent lawsuit in the United States District Court for the District of Columbia. See Pendleton v. Gonzales, 518 F. Supp. 2d 45, 47 (2007). The court dismissed that suit, concluding that "[b]ased on the evidence in the record . . . the Court finds that the plaintiff has failed to demonstrate that the defendant's proffered explanation of plaintiff's non-selection was pretextual." Id. at 50.

In January 2005, OIG posted an announcement for two additional Senior Special Agent positions in OIG's Washington Field Office, for which Pendleton applied. See Def.'s Mem. in Supp. of Mot. for Summ. J. [Docket Entry 23], Def.'s Statement of Material Facts ("Def.'s SOF"), Exhibit 1 (vacancy announcement OIG-2005-05 for Senior Special Agents at OIG ("OIG-2005-05 Vacancy Announcement")).[1] A three-member panel of Investigation Division Managers, established by Assistant Inspector General for Investigations Thomas McLaughlin, reviewed the applications for the two Senior Special Agent positions. See Def.'s Reply in Supp. of Mot. to Dismiss or Transfer [Docket Entry 12], Exhibit 2 (interrogatories for Thomas McLaughlin ("McLaughlin Interrogatory")), 14. The panel comprised Charles Huggins, the Special Agent in Charge of OIG's Washington Field Office; William Johnson, an Assistant Special Agent in Charge at OIG headquarters; and John Oleskowicz, an Assistant Special Agent in Charge of OIG's Chicago Field Office. See Def.'s SOF, Exhibit 7 (Feb. 28, 2006 interrogatories for Charles

---

[1] The vacancy announcement "initially contemplated adding only one [Senior Special Agent] position to the [Washington Field Office]," but OIG decided to add an additional position. Def.'s SOF, Exhibit 12 (Jan. 4, 2007 Decl. of Thomas McLaughlin), ¶ 3,

Huggins ("Huggins Interrogatory")), 3.[2]

The panel considered eight candidates for the two Senior Special Agent positions. Each panel member independently reviewed each candidate's application package. See id., Exhibit 5 (Dep. of John Oleskowicz ("Oleskowitz Dep.")), 16:15-17:10; id., Exhibit 6 (Dep. of William Johnson ("Johnson Dep.")), 14:19-15:2;[3] Huggins Interrogatory at 3. Where a panel member lacked specific knowledge of a candidate, McLaughlin encouraged them to obtain preliminary information from the applicant's first-line supervisor. See Def.'s SOF, Exhibit 8 (Dep. of Thomas McLaughlin), 27:11-20.

After the panel members completed their individual analyses, they interviewed the candidates. See Huggins Interrogatory at 3. During the interview, the panel asked each candidate the same thirteen questions from a prepared list. See id., Exhibit 2 (March 16, 2005 memorandum from Charles Huggins to Thomas McLaughlin ("Huggins Memo"), 2; id., Exhibit 3 (Candidate Questions -- Senior Special Agent). Following the interviews, the panelists independently ranked the candidates from one to eight, with one indicating the panelist's top choice. See Huggins Memo at 2. The panel members then reconvened to discuss their rankings.

---

[2] Senior Special Agent positions are "designed as promotions to leadership roles for exceptional current OIG Special Agents who ha[ve] demonstrated excellent investigative, writing, organizational, and leadership skills." Def.'s SOF at ¶ 3 (citing OIG-2005-05 Vacancy Announcement at 5). OIG therefore ranked Senior Special Agent candidates on (1) ability to "coordinate and conduct the full range of investigative activities"; (2) "[a]bility to effectively present information both orally and in writing"; (3) "[e]xpert knowledge of the OIG . . . in order to plan, conduct and coordinate investigations related to fraud, waste, abuse and other mismanagement"; and (4) "[s]kill in recognizing, developing and presenting evidence" that establishes legal liability "in a manner that meets requirements for presentation in various legal hearings and court proceedings." OIG-2005-05 Vacancy Announcement at 5.

[3] Where both parties have submitted excerpts of the same deposition in support of their motions, the Court has cited only to the transcript filed by OIG.

See Johnson Dep. at 48:6-16.

The three panel members each ranked their first five choices in the same order: Michael Tompkins, Scott Myers, Michael Fletcher, Mark Pendleton, and Steven Carrera. See Huggins Memo at 2. These choices, along with the panel's ranking of the final three individuals, were forwarded to Thomas McLaughlin, who, although he retained ultimate authority to select the Senior Special Agents, deferred to the panel in hiring decisions. See Def.'s Mot. to Dismiss or Transfer [Docket Entry 7], Jan 17, 2008 Decl. of Thomas McLaughlin, ¶ 10. Tompkins accepted a different position, and therefore McLaughlin selected Myers and Fletcher, the panel's top remaining choices, to be Senior Special Agents. See McLaughlin Interrogatory at 4. As a result of his non-selection, Pendleton filed an Equal Employment Opportunity Commission charge of discrimination and retaliation, which has led to this action.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Thus, the non-moving party cannot rely on mere speculation or compilation of inferences to defeat a motion for summary judgment. See Hutchinson v. Cent. Intelligence Agency, 393 F.3d 226, 229 (D.C. Cir. 2005). Nor can the non-moving party rely on hearsay statements or conclusory statements with no evidentiary basis to establish a genuine issue of material fact. See Assoc. of Flight Attendants v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Moreover, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. See Celotex, 477 U.S. at 322; see also Anderson, 477 U.S. at 252 (summary judgment appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]").

## ANALYSIS

### I. McDonnell Douglas Framework

The Court considers Pendleton's claims for discrimination and retaliation under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff must first establish a prima facie case of discrimination or retaliation by a preponderance of the evidence. Id. To show a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (citing Brown v. Brody,

199 F.3d 446, 452 (D.C. Cir. 1999)).  A prima facie case of retaliation, similarly, requires a plaintiff to establish "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory explanation for its actions.  See Smith v. Dist. of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005).  In asserting a legitimate, non-discriminatory or non-retaliatory explanation, an employer "need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981) (citation omitted).

If a defendant offers a legitimate, non-discriminatory or non-retaliatory reason for its actions, "the district court need not -- and should not -- decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  Rather, the sole inquiry becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008).  In other words, the McDonnell Douglas burden-shifting framework essentially disappears and the only remaining issue is whether the employer discriminated or retaliated against the employee.  See Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009).  In evaluating whether the plaintiff may overcome summary judgment, "the court reviews each of the three relevant

categories of evidence -- prima facie, pretext, and any other -- to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." Id. at 679 (quoting Waterhouse v. Dist. of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002)).

## II.   Pendleton's Claim of Retaliation

Pendleton alleges that by not selecting him for either of the two available Senior Special Agent positions in 2005, OIG retaliated against him for filing an EEOC charge of discrimination in 2003 and subsequently initiating a lawsuit based on that charge.[4] OIG offers a legitimate, non-retaliatory reason for not selecting Pendleton and instead selecting Myers and Fletcher as Senior Special Agents: "In sum, they were better qualified than Plaintiff." Def.'s Mot. at 13; see also Huggins Memo at 2-4. Thus, the Court looks to the totality of the evidence in the record to determine whether OIG's asserted justification for Pendleton's non-selection merely disguises retaliation.

Pendleton deploys three arguments to support his contention that OIG's preference for Myers and Fletcher was retaliatory. First, he argues that his qualifications were superior to those of either Myers or Fletcher. Second, he submits that there were "inconsistencies" in the selection process. Third, he opines that the temporal proximity of his protected activity and his non-selection raises an inference of retaliation.

---

[4] There is no dispute that Pendleton's non-selection qualifies as an adverse personnel action. See Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 57, 60 (2006) (in retaliation claims an employer's action must be "materially adverse," meaning "likely" to "dissuade[] a reasonable worker from making or supporting a charge of discrimination").

A.  Pendleton Was Not Significantly More Qualified than Either Myers or Fletcher

Where "an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was 'significantly better qualified for the job' than those chosen." Adeyemi, 525 F.3d at 1227 (quoting Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006)). When candidates' comparative qualifications are close, "a reasonable jury would not usually find [retaliation] because the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'" Id. (quoting Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

Here, Pendleton contends that he was significantly more qualified than either of the individuals who were selected as Senior Special Agents. The evidence in the record, however, does not support his assertion. Per the vacancy announcement for the Senior Special Agent positions, the panel evaluated the Senior Special Agent candidates on their ability to plan and conduct complex investigations, leadership potential, writing ability, and briefings and oral presentations. See OIG-2005-05 Vacancy Announcement at 5. In addition, the panel considered a candidate's performance at his or her interview. See Huggins Memo at 2. The Court will take each qualification in turn. Based on these criteria, Pendleton cannot demonstrate that the qualifications gap between him and the two individuals selected was "wide and inexplicable." Lathram v. Snow, 336 F.3d 1085, 1091 (D.C. Cir. 2003).

First, although Pendleton had twenty-five years of law enforcement investigative experience, including sixteen years at OIG, see Def.'s SOF, Exhibit 36 (Pendleton Application

for Senior Special Agent ("Pendleton Application")), 12, both Myers and Fletcher also had more than two decades of similar experience, see id., Exhibit 28 (Myers Application for Senior Special Agent ("Myers Application")), 4; id., Exhibit 17 (Fletcher Application for Senior Special Agent ("Fletcher Application")), 4.  And during their careers, all three candidates completed numerous investigations.  See Pendleton Application at 12; Myers Application at 4; Fletcher Application at 4.

Pendleton suggests that his investigative experience should be given greater weight because he had more experience at OIG than either Myers or Fletcher.  It is not for the Court, however, to assess which qualities should "weigh[] more heavily" for an employer.  Barnette v. Chertoff, 453 F.3d 513, 517 (D.C. Cir. 2006).  Although the panel considered Pendleton's extensive experience at OIG in evaluating his application, see Oleskowicz Dep. at 58:16-59:19, it ultimately decided that Myers's and Fletcher's other qualifications "seemed to compensate for" their relative lack of experience at OIG, id. at 59:22.  The Court has no basis to second guess this explanation.

Pendleton also contends that he was more qualified to plan and conduct complex investigations because his investigative experience "dwarfed Mr. Fletcher's and Mr. Myers' combined," as "[n]either of the two had completed a priority investigation before being selected."  Pl.'s Opp'n at 18.  But Pendleton does not explain why his having completed more "priority" investigations automatically outweighs Myers's or Fletcher's investigative experience.  In fact, the record indicates that a "priority" investigation may not be more impressive or more difficult than a regular investigation, but rather may merely deal with subject matter of special interest to the

Department of Justice Inspector General.[5]  See Def.'s SOF, Exhibit 4 (Dep. of Mark Pendleton ("Pendleton Dep.")), 56:1-22.  As indicated above, the Court will not independently assess which qualifications an employer should consider important for a particular position.

Second, both Myers and Fletcher demonstrated sustained leadership throughout their careers.  See Fletcher Application at 2 (indicating he served as the "squad supervisor for a group of 20 special agent/criminal investigators"); Myers Application at 2 (showing that he served as "manger of [a] 35 member polygraph program").  Pendleton, on the other hand, admitted that he had never been designated as a supervisor, instead only acting as a supervisor for "maybe a week or two, here or there."  Pendleton Dep. at 77:17-18.

Pendleton contends, however, that it was inappropriate for the panel to consider leadership experience because Senior Special Agents "are not supervisors and prior supervisory experience is not required."  Pl.'s Opp'n at 34.  But the position's vacancy announcement indicates that the agents would be "reviewing . . . investigative work products . . . [and] participating as a management official in developing field office policy."  OIG-2005-05 Vacancy Announcement at 5 (emphasis added).  Although the phrases leadership experience or leadership potential "may not have been specifically mentioned in the vacancy announcement[,] . . . they were fairly encompassed within the announcement."  Adeyemi, 525 F.3d at 1228.  Hence, the

---

[5] Moreover, the record indicates that OIG officials had mixed opinions of the quality of Pendleton's investigative work.  Compare Def.'s SOF, Exhibit 21 (May 17, 2004 interrogatories of Charles Huggins), 6 (Pendleton had "consistent difficulties" conducting investigations), with Pl.'s Opp'n, Statement of Material Facts ("Pl.'s SOF"), Exhibit 8 (Dep. of Willie Haynes), 30:15-17 (Pendleton's work was "excellent" in general).  But even if the Court considered only Hanyes's opinion that Pendleton's work was "excellent," this says nothing about the comparative quality of either Myers's or Fletcher's work.  See Adeyemi, 525 F.3d at 1227 (burden on plaintiff to show he was more qualified than selectees).

panel's consideration of the candidates' leadership experience was not inappropriate. See Jackson v. Gonzales, 496 F.3d 703, 709 (D.C. Cir. 2007) (that an employer "based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment").

Taking another tack, Pendleton notes that the selectees for the 2003 Senior Special Agent positions did not have leadership experience, and therefore "[t]he agency's sudden reliance on prior supervisory experience as a decisive factor for non-supervisory positions is compelling evidence of disparate treatment." Pl.'s Opp'n at 24. For Pendleton to raise an inference of discrimination, however, he would have to demonstrate that the selectees for the 2003 Senior Special Agent position were chosen over equally qualified candidates who also had supervisory experience, or that the alleged changes were adopted in order to disadvantage a protected class. There is no evidence in the record that either is true.

Third, the record demonstrates that both Myers and Fletcher were considered good writers. See Johnson Dep. at 22:6-7 (indicating that Myers's supervisor described him as an "excellent report writer"); id. at 24:17-18 (stating that Fletcher's supervisor indicated he "[w]rites a very good report"). In contrast, Pendleton's supervisor opined that Pendleton "had a little trouble writing reports, couldn't get them through very quickly, wasn't very timely at all." Id. at 36:18-20. Pendleton disputes this characterization of his writing ability. He points to a Sustained Superior Performance Award he received in 2003 that congratulated him, among other things, for being "a good report writer whose reporting routinely conforms to established OIG guidelines." See Pendleton Decl., Exhibit 1 (2003 Sustained Superior Performance Award). But

even if the Court discounts the criticism of Pendleton's written work, the fact that he may have been a "good report writer" does not demonstrate that he was a superior writer to either Myers or Fletcher.

Fourth, all three candidates briefed senior-level Department of Justice officials during their careers. See Myers Application at 9; Fletcher Application at 8; Pendleton Application at 9. And Pendleton does not offer any evidence suggesting that his briefings or oral presentation skills significantly outstripped those of the selectees.

Fifth, the panel members extolled both Fletcher's and Myers's interview skills. See, e.g., Def.'s SOF, Exhibit 18 (Oleskowicz Interview Notes), 8 (describing Fletcher as "[e]xtremely articulate); id. at 15 (describing Myers as "[e]xceptionally articulate in interview"). The panel had a more mixed appraisal of Pendleton's interview. Compare Def.'s SOF, Exhibit 19 (Johnson Interview Notes), 1 (indicating that Pendleton "didn't really answer several of the questions"), and Def.'s SOF, Exhibit 20 (Huggins Interview Notes), 15 (noting that Pendleton gave "weak/disjointed asnwer[s]" to several questions), with Oleskowicz Interview Notes at 1 (describing Pendleton as "easy to get along with -- good interpersonal skills"). The Court need not belabor the point: Pendleton has not provided any evidence that his interview was substantially better than the interview of either Myers or Fletcher.[6]

* * * * *

---

[6] In his deposition, Pendleton disputed Huggins's characterization of his interview performance: "Q: Did you think, in your opinion, that you rambled during your interview? A. I don't believe so. Q: Or that you failed to answer questions? A: I don't believe so." Pendleton Dep. at 35:21-36:3. But even were the Court to credit Pendleton's recollection over that of both Huggins and Johnson, the fact that Pendleton may have had a good interview says nothing about Myers's or Fletcher's interview performance.

Pendleton undoubtedly was qualified for the position of Senior Special Agent -- the selection panel ranked him an "above average candidate." Huggins Memo at 4. But both Myers and Fletcher were qualified as well, a fact Pendleton himself admits: "These guys, as I said, they're qualified, very qualified." Pendleton Dep. at 115:19-20. In a comparative qualifications claim, the plaintiff must do more than show that he was qualified, or even as qualified as the selectees. Here, Pendleton has not satisfied his burden of establishing that he was significantly more qualified than the selectees. See Adeyemi, 525 F.3d at 1227. The Court will "not reexamine governmental promotion decisions where it appears the government was faced with a difficult decision [among several] qualified candidates, particularly where there is no other evidence that race [or retaliation] played a part in the decision." Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003).

B. Inconsistencies in the Selection Process

Although Pendleton cannot establish that he was significantly more qualified to be a Senior Special Agent than either of the selectees, "[a] plaintiff attacking a qualifications-based explanation is . . . not limited to comparing his qualifications against those of the successful candidates." Aka, 156 F.3d at 1295. The plaintiff also can "seek to expose other flaws in the employer's explanation," for example by showing "that the employer's explanation was fabricated after the fact," or "that the employer's explanation misstates the candidates' qualifications." Id. Here, Pendleton contends that even if his qualifications were not vastly superior to those of the two selectees, three "inconsistencies" in the selection process demonstrate that his non-selection was retaliatory: (1) Powell "grossly misstated" Pendleton's writing ability to the panel, see Pl.'s Opp'n at 28; (2) "Huggins' Memo reveals that he omitted informing panel members and

McLaughlin about Mr. Pendleton's many investigative accomplishments for OIG," id. at 30; and (3) the panel members did not independently rank the candidates, see id. at 33. None of these arguments raises an inference of retaliation, however.

First, Pendleton argues that Powell "led Mr. Johnson to believe that Mr. Pendleton had [writing] performance issues that were much more than minor, and conveyed information to Mr. Johnson that was 'obviously inconsistent' with Mr. Pendleton's appraisals and awards." Pl.'s Opp'n at 29 (internal quotation marks omitted). Specifically, Pendleton objects to the fact that "[t]he information Powell conveyed to Mr. Johnson about Mr. Pendleton's writing simply did not square with Mr. Pendleton's 2003 Sustained Superior Performance Award which cited him for being 'a good report writer whose reporting routinely conforms to established OIG guidelines.'" Id. (citing 2003 Sustained Superior Performance Award). Powell, however, did not evaluate Pendleton for the 2003 award; another individual did so. The mere fact that two individuals assessed Pendleton's writing differently is not, by itself, evidence of discrimination.

To be sure, Pendleton attempts to supply evidence of discrimination by alleging that Powell's criticism of Pendleton's writing conveyed to Johnson was inconsistent with Powell's earlier assessments of Pendleton's writing. In support, Pendleton observes that during a yearly review of Pendleton's performance, Powell rated Pendleton's writing "identically to [the writing of] top ranked candidate Michael Tompkins, who was viewed as an excellent writer." Pl.'s Opp'n at 29. Therefore, in Pendleton's view, Powell's assessment that Pendleton "had a little trouble writing reports," must have been intentionally incorrect. But in the appraisal to which Pendleton refers, he was ranked an "acceptable" writer on a binary, acceptable/unacceptable scale. See Pendleton Decl., Exhibit 8 (Pendleton Performance Appraisal Record 4/1/2003-3/31/2004), 1.

–14–

And the appraisal noted that "Pendleton's investigative and administrative reports require some editing, but are comprehensive and factually complete." id. at 2. The Court sees nothing inconsistent with Powell's subsequent assessment that Pendleton had some trouble writing. Nor will the Court convert such nuanced characterizations of a candidate's skills into evidence of discrimination.[7]

Second, Pendleton opines that Huggins's memorandum to McLaughlin delineating the panel's ranking of the candidates for the Senior Special Agent position omitted critical information about Pendleton, therefore causing McLaughlin to select Myers and Fletcher for the position. In support, Pendleton observes that the memorandum failed to list any of the awards he had received while at OIG. See Pl.'s Opp'n at 31. And he states that the memorandum failed to mention that he completed "more priority investigations than any other Special Agent in the [Washington Field Office]," while at the same time it recognized "Myers for an uncompleted FBI whistleblower case, even though he had never completed a single priority investigation." Id. at 30. But the memorandum does not list any of the awards any of the candidates had received. See Huggins Memo at 2-4. And although it is true that the memorandum discussed some of the investigative accomplishments of the first three candidates, the memorandum omits this information in its description of the other five candidates. See id. That is, for the three candidates the memorandum lists as "outstanding" -- Tompkins, Myers, and Fletcher -- the panel listed some of their investigative accomplishments. For the final five candidates -- those who

---

[7] Although Pendleton suggests that Powell considered Tompkins an "excellent" writer, there is no evidence in the record reflecting this assessment. To support his belief, Pendleton cites Huggins's statement that Huggins considered Tompkins an "excellent" writer. See Pl.'s Opp'n at 29 (citing Pl.'s SOF, Exhibit 10 (May 14, 2009 deposition of Charles Huggins), 52:7). Of course, this does not demonstrate that Powell considered Tompkins to be an excellent writer.

–15–

were ranked "above average" or "average" -- the memorandum omits this information. A reasonable jury could not conclude from this record that the panel minimized the description of Pendleton's qualifications in retaliation for protected activity.

Moreover, McLaughlin appears to have made the Senior Special Agent selections based not on the details of the memorandum, but rather only on the final ranking offered by the panel. Indeed, McLaughlin avers that he has "approved the panel recommendations for each and every one of the 17 [Senior Special Agent] positions the OIG has filled during my tenure," consistent with the "negligible role" he plays in selecting Washington Field Office Senior Special Agents. McLaughlin Decl. at ¶ 10. Because the undisputed evidence is that McLaughlin did not select agents based on the candidate descriptions in the memorandum, the presence or absence of specific information concerning Pendleton in the memoradnum does not raise an inference of retaliation.

Third, Pendleton contends that Huggins's statement that the panel members "independently ranked the first five candidates in the same order," Huggins Memo at 2, is false. See Pl.'s Opp'n at 33. Instead, Pendleton posits that "Huggins worked on Mr. Oleskowicz to discount the importance of Mr. Pendleton's years of service at OIG . . . and withheld critical information about Mr. Pendleton's performance." Id. But the undisputed evidence in the record confirms that Pendleton's account is incorrect. Although the record indicates that Oleskowicz and Huggins did debate the importance of years of service at OIG, see Oleskowicz Depo. at 56:5-58:12, this debate took place after the panel members individually had ranked the candidates, see id. at 59:12-13. That is, Oleskowicz had already ranked Pendleton fourth before he and Huggins debated how much weight to give a candidate's experience at OIG. Moreover, Oleskowicz states

that Huggins played no more prominent a role in discussions about the candidates than either himself or Johnson, and that Huggins did not have any input into the other panelists' rankings before they recorded them.[8] See id. at 34:18-21; id. at 53:9-12 ("Q: And did Mr. Huggins, who was on the selection panel, have any input into your rankings before your wrote them down? A: No, he did not."). Despite Pendleton's accusations, then, the undisputed evidence indicates that the panel fairly considered each candidate's qualifications for the Senior Special Agent position.

* * * * *

None of Pendleton's three allegations demonstrates that there were meaningful inconsistencies in OIG's selection process for the Senior Special Agent positions. Accordingly, a reasonable juror could not conclude from the evidence that OIG's legitimate, non-retaliatory reason for not selecting Pendleton merely disguised illegitimate bias.

C. Temporal Proximity

The only other argument Pendleton offers to show that OIG retaliated against him is that he engaged in statutorily protected activity during the panel's consideration of his candidacy.[9]

---

[8] Pendleton also intimates that the selection process was unfair because it included Huggins, who had been involved in Pendleton's two previous non-selections for Senior Special Agent. See Pl.'s Opp'n at 2-3, 13-14. But this conclusory allegation cannot raise an inference of discrimination. See Byrd v. Envt'l Prot. Agency, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999) ("It is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact." (internal quotation marks omitted)). Moreover, Pendleton's claim is rebutted by the undisputed evidence that the three panel members independently rated the candidates, each ranking Pendleton fourth. See Huggins Memo at 2; see also Pendleton Dep. at 183:3-7 ("Q: Do you have any evidence to suggest that Tom Huggins overruled the other panel members in placing you in the place that you were placed [in the memorandum]? A: No specific evidence.").

[9] According to Pendleton, the panel convened in February and March 2005 to review candidates for the Senior Special Agent position, by which time he had filed a Title VII action in this District. See Pendleton v. Ashcroft, 1:04-cv-01838-RJL (filed Oct. 22, 2004); see also Williams v. Dodaro, --- F. Supp. 2d ---, 2010 WL 744761, *4 (D.D.C. March 5, 2010) (ongoing

Temporal proximity alone, however, is insufficient to rebut OIG's legitimate reason for Pendleton's non-selection. See Woodruff v. Peters, 482 F.3d 521, 530 (D.C. Cir. 2007); Butler v. Dist. of Columbia Housing Fin. Agency, 593 F. Supp. 2d 61, 67 n.13 (D.D.C. 2009) (employee "cannot rely on temporal proximity alone to establish pretext; he must point to additional evidence"). "If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." Woodruff, 482 F.3d at 530. It would be especially troubling in cases where an employer sought to fill a vacancy by choosing among equally qualified candidates, for it would present the employer with an unpalatable choice (i.e. a Morton's fork): either leave the position vacant for an indeterminate time or fill it while the candidate was engaged in protected activity and risk litigation. The latter option would end-run the D.C. Circuit's repeated insistence that courts "not reexamine governmental promotion decisions where it appears the government was faced with a difficult decision [among several] qualified candidates." Stewart, 352 F.3d at 430.

To be sure, the D.C. Circuit has suggested that there are "exceptional circumstances" where "the evidence supporting a plaintiff's prima facie case [, which may include evidence of temporal proximity,] may, on its own, suffice to defeat the [legitimate, non-retaliatory] proffer's presumption of validity and thus render summary judgment improper." Woodruff, 482 F.3d at 530; accord Jones, 557 F.3d at 680. This, however, is not that case. The agency has not undertaken a specific action with respect to Pendleton (e.g. termination, demotion), but rather simply has undertaken to fill a vacancy by choosing among qualified candidates. Pendleton's

---

litigation a statutorily-protected activity).

only evidence of retaliation is the temporal proximity between his protected activity and his non-selection. And he does not rely on some specific event in his ongoing litigation as triggering any adverse action towards him. Taken together with the complete absence of evidence of pretext, the Court finds that Pendleton has not identified sufficient evidence in the record to permit a reasonable jury to infer that his non-selection was in retaliation for Title VII-protected activity.

### III. Pendleton's Claim of Discrimination

Pendleton also alleges that his non-selection for the Senior Special Agent positions was discriminatory. OIG offers the same legitimate, non-discriminatory explanation for Pendleton's non-selection: Myers and Fletcher were more qualified. See Def.'s Mot. at 13; see also Huggins Memo at 2-4. Hence, the only question that remains is whether the employer discriminated against the employee. See Jones, 557 F.3d at 678. But Pendleton presents the same evidence to support this claim that he presents to support his retaliation claim. And the Court has already found this evidence insufficient to raise an inference of retaliation. So too here: Pendleton cannot show that his non-selection was discriminatory in the face of OIG's proffered legitimate, non-discriminatory reason for his non-selection.

### CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

/s/
John D. Bates
United States District Judge

Dated: March 22, 2010